No. 67,953

STATE OF KANSAS, *Appellant,* v. MICHAEL BARKER, *Appellee.*

(850 P.2d 885)

Opinion filed April 16, 1993.

*Ellen H. Mitchell,* assistant county attorney, argued the cause, and *Thomas R. Stanton,* assistant county attorney, *Julie McKenna,* county attorney, and *Robert T. Stephan,* attorney general, were on the brief for appellant.

*Benjamin C. Wood,* special assistant appellate defender, of Olathe, argued the cause, and *Jessica R. Kunen,* chief appellate defender, of Topeka, was with him on the brief for the appellee.

The opinion of the court was delivered by

DAVIS, J.: This is an interlocutory appeal by the State from an order suppressing evidence seized in connection with a traffic checklane operation. We affirm the trial court's suppression of evidence on the narrow basis that because of a lack of foundation evidence, the State failed to establish probable cause for the search of defendant's automobile.

On November 20, 1991, the Kansas Highway Patrol and other law enforcement agencies set up a checklane as part of a law enforcement effort called "Span 70." The checklane was part of a national law enforcement project, the purpose of which was to create a strong law enforcement presence along the entire expanse of Interstate 70. The traffic checklane was a local multijurisdictional law enforcement effort to focus on checking drivers' licenses and reducing "accident-related causative factors."

The operation was implemented on November 20, 1991, from 2:00 a.m. until 6:00 a.m. A briefing was held for all personnel involved, including the Kansas Highway Patrol, Saline County Sheriff's Department, Dickinson County Sheriff's Department, Saline County Attorney's Office, Kansas Department of Transportation, and the Bureau of Alcohol, Tobacco, and Firearms prior to the commencement of the checklane stops.

The checklane was set up at a rest area just west of Solomon in Saline County in such a way that all traffic on the interstate, whether eastbound or westbound, could be funneled into the rest

area and stopped. Signs were posted approximately 500 feet from the entrances to the rest area, advising motorists of the checklane. There was no advance publicity regarding the checklane.

The defendant entered the checklane in his car at approximately 4:35 a.m. Trooper Rick Bigham, who was checking defendant's driver's license, smelled alcohol and asked defendant to submit to a preliminary breath test. Defendant agreed to do so and went to the patrol car to take the test. The test indicated that his blood alcohol level was below the legal limit. At some point during defendant's detention, another officer walked a narcotics-detecting dog around defendant's car. The dog "alerted." After the dog's response, Trooper Michael Murphy searched the front seat area of defendant's car and found a bag containing what appeared to be marijuana. The defendant was arrested, and an inventory search of his automobile was conducted. Because it was cold on that night, Trooper Murphy took a coat from inside the defendant's automobile and gave it to the defendant to wear. Prior to giving defendant his coat, however, the trooper checked the pockets for weapons and contraband. In one pocket, the trooper found a white envelope containing a white powdery substance. Trooper Murphy made the statement, "This is cocaine or methamphetamine." Trooper Murphy testified that the defendant replied that it was his cocaine from a year ago.

The defendant moved to suppress the physical evidence and to suppress his statement to Trooper Murphy. The district court granted defendant's motion on the following grounds:

"[T]here is no statutory authority for roadblock traffic stops and the roadblock traffic stop of the defendant's vehicle on November 20, 1991 is an unconstitutional violation of the separation of powers between the legislative and executive branches of Kansas government; that the roadblock traffic stop on November 20, 1991 violates the defendant's right of travel; that the roadblock traffic stop of November 20, 1991 was not conducted in compliance with the requirements of *State v. Deskins*, 234 Kan. 529, 673 P.2d 1174 (1983); that the resulting search of the defendant's car occurred in violation of the defendant's rights under the 4th and 14th Amendments to the United States Constitution and Section 15 of the Bill of Rights of the Kansas Constitution. The defendant's car was searched by a drug dog without probable cause being established on the record in that no evidence was introduced from the handler of the dog as to training, background, characteristics and capabilities of the dog which would justify intrusion into the defendant's vehicle and no evidence of scientific reliability or acceptance per the *Frye* test was

introduced to suggest reliability of the handler's perceptions and/or the dog's reactions; and that, therefore, for all of the above and foregoing reasons, as fully set forth on the record of the hearing, the evidence obtained as a result of the unlawful stop and search of the defendant's car, including the physical evidence, and defendant's statements should be suppressed as evidence at the defendant's trial."

In its appeal, the State identifies the following six issues:

(1) The district court erred in ruling that legislative authority is required for the establishment of checklane roadblocks;

(2) the district court erred in ruling that the checklane in this case failed to comply with the requirements of *State v. Deskins,* 234 Kan. 529, 673 P.2d 1174 (1983);

(3) the district court erred in ruling a narcotics dog "sniff" of the exterior of a vehicle constitutes a search;

(4) the district court erred in ruling that the *Frye* test applies to the use of a narcotics dog;

(5) the district court erred in ruling that the stop of defendant's automobile violated his right of travel; and

(6) the district court erred in suppressing the substance found in the defendant's coat pocket and his subsequent statement concerning the substance.

### (1) *Legislative Authorization*

Upon oral argument, the defendant concedes that this issue has been resolved against him in our recent opinion of *Davis v. Kansas Dept. of Revenue,* 252 Kan. 224, Syl. ¶ 1, 843 P.2d 260 (1992):

"Sobriety checkpoints have been found to be constitutional under the United States Constitution Fourth Amendment and the Kansas Constitution Bill of Rights § 15. Thirteen factors established in *State v. Deskins,* 234 Kan. 529, 673 P.2d 1174 (1983), are relevant in balancing State interests against intrusion upon individual rights. *Specific legislative authorization is not a prerequisite to the validity of sobriety checkpoints.*" (Emphasis added.)

### (2) *State v. Deskins*

Law enforcement personnel's compliance with procedural safeguards is essential when they detain citizens at checklanes. Such stops and detentions are seizures within the meaning of the Fourth Amendment to the United States Constitution "even though the purpose of the stop is limited and the resulting detention quite brief." *State v. Deskins,* 234 Kan. 529, Syl. ¶ 3. Accord *Delaware v. Prouse,* 440 U.S. 648, 653, 59 L. Ed. 2d 660, 99 S. Ct. 1391 (1979). The United States Supreme Court recognizes that

" '[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.' *Union Pac. R. Co. v. Botsford,* 141 U.S. 250, 251 (1891)." *Terry v. Ohio,* 392 U.S. 1, 9, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1967).

The Fourth Amendment to the United States Constitution protects individuals against " 'arbitrary invasions by government officials' by imposing a standard of reasonableness upon the exercise of those officials' discretion." *Deskins,* 234 Kan. at 540. Generally, stopping and detaining a motorist is an unreasonable seizure for purposes of the Fourth Amendment unless the police officer has at least some "articulable and reasonable suspicion that the motorist . . . or an occupant is otherwise subject to seizure for violation of the law." *Deskins,* 234 Kan. 529, Syl. ¶ 4.

The "checklane" cases have carved out an exception to this general rule in circumstances in which the checklane (sometimes referred to as checkpoint or roadblock) complies with the procedures to properly balance the public interest against the interference with personal freedom. In *Deskins,* we identified various factors that should be considered in determining whether a stop at a traffic checklane is reasonable when there is neither a warrant nor probable cause to otherwise justify the stop:

"(1) The degree of discretion, if any, left to the officer in the field; (2) the location designated for the roadblock; (3) the time and duration of the roadblock; (4) standards set by superior officers; (5) advance notice to the public at large; (6) advance warning to the individual approaching motorist; (7) maintenance of safety conditions; (8) degree of fear or anxiety generated by the mode of operation; (9) average length of time each motorist is detained; (10) physical factors surrounding the location, type and method of operation; (11) the availability of less intrusive methods for combating the problem; (12) the degree of effectiveness of the procedure; and (13) any other relevant circumstances which might bear upon the test." 234 Kan. at 541.

Not all of the factors must be favorable to the State, but some, such as the "unbridled discretion of the officer in the field, would run afoul of *Prouse* regardless of other favorable factors." 234 Kan. at 541. The burden of proof is on the State to prove that its search and seizure of an individual is reasonable under the Fourth Amendment. See *State v. Damm,* 246 Kan. 220, 222, 787

P.2d 1185 (1990) ("Upon the hearing of a motion to suppress evidence, the State bears the burden of proving to the trial court the lawfulness of the search and seizure."); *State v. Hanes*, 3 Kan. App. 2d 125, 590 P.2d 597, *rev. denied* 225 Kan. 846 (1979) (warrantless searches per se unreasonable; burden on State to prove exception to warrant requirement applies).

### *State v. Deskins* Factors

Discretion. All motorists were stopped, both eastbound and westbound, during the duration of the operation. While defendant was detained for 30 minutes between the stop and his ultimate arrest, the average time of detention to check for drivers' licenses was 45 seconds.

Defendant contends that the officers "had unbridled discretion . . . once a car was drawn into the net." Thus, according to defendant, even assuming that the initial moment of detention was lawful, there were no guidelines concerning whether a motorist could be detained further for a drug dog to be obtained and for a drug investigation to be conducted. The purposes of the checklane were to check drivers' licenses, to reduce "accident-related causative factors," to check for drunk drivers, and to achieve "drug interdiction." This, however, does not translate into a general law enforcement purpose.

Contrary to defendant's assertion, the officers did not have "unbridled discretion" regarding detention beyond the initial stop. Any detention beyond the initial stop by the officer is subject to the limitations imposed by the United States Constitution. Absent evidence establishing some exception to the Fourth Amendment's prohibition of unreasonable seizure, such as the officers' articulable and reasonable suspicion that the motorist or an occupant is otherwise subject to seizure for violation of the law, the officers had no real discretion to detain a driver or occupant beyond the initial stop.

The officers recognized the limitation on their discretion. They testified that further detention was based on the facts disclosed during the initial legal stop as evaluated in light of their experience as law enforcement officers.

While defendant claims there were no guidelines to the exercise of discretion with reference to use of the drug dog, the use of

the drug dog, as will be shown later, does not constitute a search under the Fourth Amendment to the Constitution. Thus, if the dog could be used during the initial authorized stop, resulting in no detention beyond the time required for the lawful stop, or if the officers were able to demonstrate some articulable and reasonable suspicion that a motorist or an occupant is otherwise subject to seizure for violation of a drug law, then additional detention would be permitted under *Terry v. Ohio.* Beyond that, the officers had no discretion.

As we understand the record in this case, an officer's basis for detaining a car beyond the initial stop for purposes of checking for drugs was dependent upon the individual officer's experience and whether that officer had an articulable and reasonable suspicion that the motorist was violating the law. The officers did not have unbridled discretion to detain any individual beyond the initial stop. The overall plan of the checkpoint was not then an arbitrary invasion by government officials.

In *United States v. Walker,* 941 F.2d 1086 (10th Cir. 1991), the defendant was legally stopped for speeding. However, his continued detention by a law enforcement officer in order for the officer to ask the defendant intrusive questions unrelated to the traffic stop was found to be a violation of the defendant's Fourth Amendment rights; cocaine that had been seized as a result of the stop was ordered suppressed. The court found under those facts there was a "lack of any constraint on an officer's decision to detain some individuals and to let others go." 941 F.2d at 1089. We do not perceive from the record that there was any "lack of any constraint on an officer's decision to detain some individuals and to let others go." *Walker* can be distinguished from the facts in this case. Here, the defendant was detained beyond the initial stop because the officer smelled alcohol, not because of a suspicion that a drug violation was occurring.

Location. Defendant contends that the location was unreasonable because it was not possible to avoid the checklane. The entire purpose of the checklane was to stop all vehicles. It was planned and initiated with the idea that there would be no possibility of avoiding the checklane. Without such a location, it would have been impossible to carry out the objectives of the checklane.

Time and duration. These factors are not in issue.

Standards set by superiors. Approximately one hour before the checklane was in effect, there was a briefing for all officers concerned. The officers were instructed "about signage" and about who would be on which side of the highway and how long the roadblock should remain in effect; they were also instructed that all vehicles were to be stopped. The briefing focused on the need to keep detentions brief and to check for licenses.

Defendant contends that the standards were deficient because there was no guidance regarding law enforcement activity beyond the direction to stop every car. Also, defendant contends that there were no standards given regarding when to use narcotics dogs. These matters have been addressed previously. Suffice it to say that any detention beyond the license check must, under the Fourth Amendment to the United States Constitution, be based upon an exception such as an articulable and reasonable suspicion that the motorist is subject to seizure for violation of another law. This is precisely what happened in the defendant's case. The officers continued to detain him based upon the smell of alcohol. While there was no documentary evidence concerning standards for the checklane, the record indicates that standards for this checklane were set by superiors of the police officers.

Advance notice to public at large. There was no notice to the public at large. While this is a valid and desirable requirement, its absence does not by itself vitiate the checklane.

Advance warning to individual approaching motorists. Approaching motorists were given notice about 500 feet before the entrance to the lane to the rest area where the checklane was taking place. It appears that the advance warning was safe and adequate.

Safety conditions. Testimony establishes that great pains were taken by the State to insure the safety of all travelers, as well as the officers involved in the operation.

Fear and anxiety. There was no evidence presented on this issue.

Average length of time each motorist was detained. The only evidence admitted on this factor was that the motorists who were not subjected to additional law enforcement activity were detained an average of only 45 seconds. While there is evidence that the

defendant was detained for 30 minutes between the stop and his ultimate arrest, there were further reasons for his continued detention based on the officer's smell of alcohol on defendant's breath. Overall, it appears that the officers complied with their initial plan of detaining motorists momentarily for the purpose of a driver's license check.

Physical factors. This was not an issue in the case, and there was no evidence presented on this factor.

Availability of less intrusive means to accomplish goal. Given the average length of time motorists were detained, and given the express purpose for the checklane, it would appear that goals set forth in operation "Span 70" were accomplished and effective.

Degree of effectiveness of the procedure. The officers testified that many citations were issued for traffic infractions, one DUI arrest was made, and three vehicles were found to contain controlled substances. While the officers testified that they did not have any documentary evidence regarding this particular checklane, their testimony was that they remembered the above results.

Effectiveness cannot be measured completely in the number of arrests that are made but must be judged in accordance with the original goal of checking licenses and creating a strong law enforcement presence along the entire span of Interstate 70. In this respect, the checklane appears to have been effective based on the procedures used.

Under all the circumstances, we conclude that, on balance, the checklane complied with the factors set forth in *Deskins.*

### (3) *Narcotics Dog "Sniff"*

The district court ruled that a narcotics dog sniff of the exterior of defendant's vehicle constituted a search. In this respect, we hold that the district court erred. There is ample support for concluding that a drug dog's sniff of the exterior of a vehicle is not a search for the purposes of the Fourth Amendment. See, e.g., *United States v. Morales-Zamora,* 914 F.2d 200, 204 (10th Cir. 1990); *United States v. Solis,* 536 F.2d 880, 883 (9th Cir. 1976); *State v. Martinez,* 26 Ariz. App. 210, 212, 547 P.2d 62 (1976); see also *United States v. Place,* 462 U.S. 696, 77 L. Ed. 2d 110, 103 S. Ct. 2637 (1983) (use of drug dog to sniff defendant's

luggage at airport not "search"); *Doe v. Renfrow,* 475 F. Supp. 1012 (N.D. Ind. 1979) (use of drug dog at public school not "search" under circumstances of case). Thus, the district court erred in concluding that the narcotics dog sniff of the exterior of the vehicle constituted a search.

Defendant contends that even if the dog sniff was not a search, it nevertheless was unconstitutional because the State did not establish that the dog sniffed the car during defendant's lawful detention. In other words, defendant contends that absent such proof, the duration of his detention exceeded its lawful scope. We believe that it is reasonable to infer from the evidence in the record that the dog sniffed the car during the time defendant lawfully was detained for the preliminary breath test. Accordingly, we conclude that the defendant was not unlawfully seized for the purpose of allowing the drug dog to sniff the exterior of his car.

### (4) *Frye Test*

Defendant concedes that the *Frye* test does not apply to the use of a narcotics dog. The *Frye* test is an evidentiary and foundational standard requiring that scientific tests be shown to be reliable before results of the test will be admitted in a legal proceeding. *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923). See *State v. Miller,* 240 Kan. 733, 736-37, 732 P.2d 756 (1987); *State v. Washington,* 229 Kan. 47, 53, 622 P.2d 986 (1981). In light of defendant's concession, we need not discuss this issue further.

### (5) *Right of Travel*

In *Jones v. Helms,* 452 U.S. 412, 418, 69 L. Ed. 2d 118, 101 S. Ct. 2434 (1981), the United States Supreme Court held that "the right of a United States citizen to travel from one State to another and to take up residence in the State of his choice is protected by the Federal Constitution." Although the right is not specifically set forth in the Constitution, the Court held that it has been consistently recognized as a legitimate right that is a "privilege of national citizenship, and . . . an aspect of liberty that is protected by the Due Process Clauses of the Fifth and Fourteenth Amendments. Whatever its source, a State may neither tax nor penalize a citizen for exercising his right to leave one State and enter another." *Jones,* 452 U.S. at 418-19. Violation

of this right, therefore, necessarily involves State action that affects on an individual's right to leave one state and enter another.

The only State action shown in this case is the operation of a traffic checklane on Interstate 70. The checklane did not discriminate between citizens of Kansas and citizens of other states. It did not restrict or otherwise affect a motorist's right to travel between states, nor did the officers running the checklane impose a tax or penalty on those they stopped. Clearly, the court erred in ruling that the traffic checklane in this case violated the right of appellee to travel.

### (6) *Probable Cause to Search*

It is not disputed that the officers searched defendant's vehicle after the dog "alerted." If probable cause existed to search the automobile, the seizure of the suspected marijuana and the arrest of defendant were lawful. If the defendant was legally arrested, the officer's search of his coat and seizure of the white powder also would be lawful, and defendant's statement about that powder would be admissible. If, however, the officers did not have probable cause for the search of defendant's automobile, all fruits of that search must be excluded.

The State in its appeal does not focus on the one basis set forth by the district court that causes us to affirm the trial court's suppression of the evidence and defendant's statement. The trial court ruled that there was no evidence introduced from the handler of the dog as to the training, background, characteristics, capabilities, and behavior of the dog that would justify the officer's intrusion into the defendant's vehicle. We have searched the record and find no such evidence. In order to establish probable cause for the search of the vehicle, some foundation testimony is necessary to establish that the "alert" of the dog provided probable cause for the search of the vehicle. On a proper showing, a narcotics dog's reaction to a vehicle may supply the probable cause necessary to justify a search of the vehicle, but there must be some evidence that the dog's behavior reliably indicated the likely presence of a controlled substance: "Obviously . . . a description of the dog's conduct, training and experience by a knowledgeable person who can interpret the conduct of the dog as signaling the presence of a controlled substance would constitute

the minimum requirement for finding probable cause." *Doe v. Renfrow*, 475 F. Supp. at 1025.

Upon remand, the State will be required to establish a necessary foundation for concluding that the dog's alert established probable cause for the officer's search of defendant's vehicle. Absent such evidence here, the trial court could not conclude that the dog's behavior established probable cause for the search of the defendant's vehicle. Thus, the trial court properly suppressed the physical evidence and the defendant's statement concerning the evidence.

Affirmed in part, reversed in part, and remanded for further proceedings.