IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
May 2, 2001 Session

**STATE OF TENNESSEE v. LARRY ALLEN HICKS**

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Hamilton County**
**No. 221717     Hon. Douglas A. Meyer, Judge**

-------

**No. E1999-00957-SC-R11-CD - Filed September 11, 2001**

-------

FRANK F. DROWOTA, III, J., concurring and dissenting.

I concur in the result reached by the majority because the evidence in this record establishes that the operation, location, and duration of this license checkpoint was solely within the discretion of Lieutenant Ronnie Hill of the Tennessee Highway Patrol. I, however, cannot agree with the analysis employed by the majority to reach this result. The majority's analysis is an unnecessary and unwarranted modification of the analysis adopted in Downey which effectively renders license checkpoints unconstitutional. In my view, license checkpoints are not per se unconstitutional, although they may be administered in an unconstitutional manner, as in this case, when supervisory approval of the location and time of the checkpoint is not sought, and/or the checkpoint is not conducted in accordance with an administrative plan containing explicit limitations on the conduct and discretion of officers in the field.

### Analysis

The facts of this case are largely undisputed and accurately stated by the majority. The majority and I disagree, however, as to the proper interpretation and application of the law. In State v. Downey, 945 S.W.2d 102, 110-11 (Tenn. 1997), we considered a constitutional challenge to sobriety checkpoints. To analyze this challenge, we adopted as the standard for the Tennessee Constitution a three-pronged balancing test which previously had been employed by the United States Supreme Court to determine the constitutionality of highway checkpoints. See Michigan v. Sitz, 496 U. S. 444, 110 S. Ct. 2481, 110 L. Ed. 2d 412 (1990) (upholding sobriety checkpoints); United States v. Martinez-Fuerte, 428 U.S. 543, 96 S. Ct. 3074, 49 L. Ed.2d 1116 (1976) (upholding highway checkpoints near the border aimed at detecting illegal aliens); See also Brown v. Texas, 443 U.S. 47, 99 S. Ct. 2637, 61 L. Ed.2d 357 (1979) (holding that application of a Texas statute permitting detention and requiring identification violates the Fourth Amendment if officers lack reasonable suspicion for the detention).

This balancing test requires consideration of "(1) the gravity of the public concerns served by the roadblock; (2) the degree to which the roadblock advances the public interests; and (3) the severity of the roadblock's interference with an individual's liberty or privacy interest." Downey, 945 S.W.2d at 107 (quoting Brown, 443 U.S. at 40-51, 99 S. Ct. at 2640). "A central concern in balancing these competing considerations in a variety of settings has been to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field." 945 S.W.2d at 107, (internal citations omitted). In the highway checkpoint context, this concern is alleviated by requiring that checkpoints be carried out pursuant to supervisory control and a plan containing explicit limitations on the conduct and discretion of individual field officers. See Id.

Applying this test in Downey, we described as "compelling," the State's interest in detecting and deterring motorists who drive while under the influence of alcohol. Moreover, we recognized that sobriety checkpoints effectively advance this interest and aid in eliminating this serious public danger. Therefore, we held that sobriety checkpoints are constitutional so long as they are "established and operated in a manner that minimizes intrusion and limits discretion." Downey, 945 S.W.2d at 110. To ensure that such checkpoints impose only minimal intrusion on individual privacy and limit official discretion, we adopted the following guidelines originally articulated by the California, Iowa, and Kansas supreme courts:[1]

> The guidelines include supervisory authority which carefully targets the time and location of roadblocks and establishes neutral procedures for their operation. They also include adequate warnings, advance publicity, minimizing length and nature of detention, adequate safety precautions, and the availability of less intrusive methods for combating the problem.

Id. at 110-11.

Downey is a very recent, unanimous, and comprehensive decision. However, rather than applying the three-pronged balancing test adopted in Downey, the majority states that license roadblocks are unconstitutional unless the State offers specific proof showing that

> drivers not possessing a license are unable to safely operate motor vehicles on the roads and highways of his state; that an unlicensed driver invariably presents an imminent danger of death or serious bodily injury to other drivers that is not typically present with licensed drivers; and that the safety threat from unlicensed drivers is of such a magnitude that the problem, coupled with its risk of harm, commands heightened attention. Only when this showing is made may courts find that the State has a sufficiently compelling interest to justify maintaining drivers' license roadblocks.

---

[1]Downey, 945 S.W.2d at 109-10 (adopting guidelines from Ingersoll v. Palmer, 743 P.2d 1299 (Cal. 1987); State v. Loyd, 530 N.W.2d 708 (Iowa 1995); State v. Deskins, 673 P.2d 1174 (Kan. 1983)).

The obvious effect of the majority's adoption of this standard – one that the State cannot possibly meet – is to hold that drivers' license checkpoints are unconstitutional in Tennessee.[2]  Indeed, two members of the Court express this view.

Such a result clearly is contrary to the overwhelming weight of authority.  State and federal courts alike almost universally employ the three-pronged balancing test adopted in Downey when analyzing the constitutionality of license checkpoints.  See, e.g., State v. Orr, 745 N.E.2d 1036, 1038-40 (Ohio 2001).  Employing this test, courts in at least twenty-five states and the District of Columbia have upheld some form of license checkpoints.[3]  This number includes one state supreme court which struck down sobriety checkpoints on state constitutional grounds.  See State v. Koppel 499A.2d 977, 980 (N.H. 1985) (striking down sobriety checkpoints but finding license checkpoints a reasonable means of enforcing a legitimate state interest because, without such checkpoints, most violations are undetectable).[4]  In addition to the many state courts, at least four circuit courts of appeal have upheld the constitutionality of license checkpoints.[5]

---

[2]As a practical matter, the majority's holding in this regard has little impact since sobriety checkpoints still may be constitutionally maintained, so long as they comport with the guidelines in Downey.  Obviously, drivers licenses can be verified at sobriety checkpoints.

[3]See McInnish v. State, 584 So.2d 935 (Ala. Crim. App. 1991); Camp v. State, 764 S.W.2d 463 (Ark. Ct. App. 1989); People v. Alvarez, 926 P.2d 365 (Cal. 1996); People v. Andrews, 484 P.2d 1207 (Colo. 1971); Howard v. Voshell, 621 A.2d 804 (Del. Super. 1992); Duncan v. United States, 629 A.2d 1 (D.C. App. 1993); Rennard v. State, 675 So.2d 1006 (Fla. Ct. App. 1996); LaFontaine v. State, 497 S.E.2d 367 (Ga. 1998); People v. Bartley, 486 N.E.2d 880 (Ill. 1985); State v. Loyd, 530 N.W.2d 708 (Iowa 1995); State v. Barker, 850 P.2d 885 (Kan. 1993); Kinslow v. Commonwealth, 660 S.W.2d 677 (Ky. Ct. App. 1983); State v. Jackson, 764 So.2d 64 (La. 2000); State v. Cloukey, 486 A.2d 143 (Me. 1985); Miller v. State, 373 So.2d 1004 (Miss. 1979); State v. Severance, 237 A.2d 683 (N.H. 1968); State v. Kabayama, 226 A.2d 760 (N.J. Super. Ct. App. Div. 1967), affirmed without opinion by 246 A.2d 714 (N.J. 1968); State v. Valencia-Olaya, 736 P.2d 495 (N.M. Ct. App. 1987); State v. Grooms, 483 S.E.2d 445 (N.C. Ct. App. 1997); State v. Wetzel, 456 N.W.2d 115 (N.D. 1990); State v. Orr, 745 N.E.2d 1036 (Ohio 2001); State v. Shankle, 647 P.2d 959 (Or. Ct. App. 1982); Commonwealth v. Blouse, 611 A.2d 1177 (Pa. 1992); Murphy v. State, 864 S.W.2d 70 (Tex. Ct. App. 1992); Lowe v. Commonwealth, 337 S.E.2d 273 (Va. 1985); State v. Davis, 464 S.E.2d 598 (W. Va. 1995).  It is also significant to note that the Tennessee Court of Criminal Appeals previously has upheld the constitutionality of license checkpoints. See, e.g., State v. Joe W. Steward, No. M1999-01284-CCA-R3-CD, 2000 WL 1246436 (Tenn. Crim. App., Aug.18, 2000) (perm. app. pending);  State v. David Lynn Hagy, No. 03C01-9505-CR-00152, 1995 WL 71(Tenn. Crim. App., Dec. 5, 1995)(Barker, J., author) (no app. filed); State v. David Arthur McCarter, No. 03C01-9406-CR-00240, 1995 WL 103704 (Tenn. Crim. App., Mar.13, 1995) (perm. app. denied Tenn. July 10, 1995).

[4]Presumably license checkpoints would be found unconstitutional in the other four states that find sobriety checkpoints unconstitutional.  See Sitz v. Department of State Police, 506 N.W.2d 209 (Mich. 1993); Ascher v. Comm'r of Public Safety, 519 N.W.2d 183 (Minn. 1994); Pimental v. Department of Transp., 561 A.2d 1348 (R.I. 1989); Seattle v. Mesiani, 755 P.2d 1057 (Wash. 1988).  Massachusetts is the only other state supreme court which has suggested that license checkpoints may be vulnerable to constitutional attack. See Commonwealth v. Rodriguez, 722 N.E.2d 429, 433 (Mass. 2000).

[5]United States v. Galindo-Gonzales, 142 F.3d 1217 (10th Cir. 1998); Merrett v. Moore, 58 F.3d 1547 (11th Cir. 1995); United States v. Trevino, 60 F.3d 333 (7th Cir.1995); United States v. McFayden, 865 F.2d 1306 (D.C. Cir. 1989).

While the United States Supreme Court has not squarely addressed this issue, the Court concluded in Delaware v. Prouse, 440 U. S. 648, 658, 99 S. Ct. 1391, 1398, 59 L. Ed.2d 660 (1979), that states have a "vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles, that these vehicles are fit for safe operation, and hence that licensing, registration, and vehicle inspection requirements are observed." The Court also suggested in Prouse that roadblock-type stops for the purpose of verifying drivers' licenses and vehicle registrations would be constitutionally permissible. Id., 440 U. S. at 653, 99 S. Ct. at 1401. More recently, in City of Indianapolis v. Edmond, 531 U.S. 32, 47, 121 S. Ct. 447, 457, 148 L. Ed. 2d 333 (2000), the Court struck down drug interdiction checkpoints implemented primarily to uncover evidence of criminal wrongdoing, but stressed that its holding did not implicate the constitutionality of license checkpoints:

> It goes without saying that our holding today does nothing to alter the constitutional status of the sobriety and border checkpoints that we approved in Sitz and Martinez-Fuerte, or of the type of traffic checkpoint that we suggested would be lawful in Prouse. The constitutionality of such checkpoint programs still depends on a balancing of the competing interests at stake and the effectiveness of the program.

Id. (emphasis added). This statement strongly indicates that when the issue is squarely presented, the United States Supreme Court, applying the same standard adopted by this Court in Downey, would uphold the constitutionality of license checkpoints[6].

I fully realize this Court is free to interpret our state constitutional provisions as affording greater protections than those afforded by the federal constitution. However, we declined to do so in Downey when we adopted the three-pronged federal test as the standard for determining the state constitutionality of highway checkpoints. In fact, we stated in Downey that "Article I, Section 7 is identical in intent and purpose with the Fourth Amendment." 945 S.W.2d at 106. Therefore, I am puzzled by the majority's decision to now re-interpret Downey as affording greater protection.[7]

---

[6]Justice Barker's opinion relies upon Edmond to support its conclusion. My reading of Edmond reveals that it in no way supports the premise that license checkpoints are unconstitutional. The Court in Edmond very carefully and clearly indicated that its holding did not affect the validity of license checkpoints. In addition, in footnote 2, the Court pointed out that the City of Indianapolis had conceded that narcotics detection was the primary programmatic purpose of the checkpoints at issue in that case. The Court based its decision on the programmatic purpose of the checkpoints, not on an individual checkpoint, so, of course, the Court did not consider the specifics of how the checkpoints were established. The Court specifically recognized that it "need not decide whether the State may establish a checkpoint program with the primary purpose of checking licenses or driver sobriety and a secondary purpose of interdicting narcotics." Edmond, 531 U.S. at 47, 121 S.Ct. at 457. This statement clearly indicates that the Court views license checkpoints as constitutionally valid in the same way it views driver sobriety checks constitutionally valid. The Edmond decision simply does not support the majority's conclusions.

[7]Effectively the majority is interpreting the United State Constitution to provide greater protection than the United States Supreme Court's own federal constitutional precedents have provided, even though the majority clearly has no authority to do so. See Arkansas v. Sullivan, __ U. S. __, 121 S. Ct. 1876, 149 L. Ed. 2d 994 (2001) (holding (continued...)

In addition, a more expansive interpretation of Article I, Section 7 is not appropriate in this context. We have previously recognized that when interpreting Article I, Section 7, we will depart from federal precedent only when "(1) adopting federal Fourth Amendment standards would require overruling a settled development of state constitutional law; and (2) when linguistic differences justify distinct interpretations of state and federal constitutional provisions." State v. Vineyard, 958 S.W.2d 730, 733-34 (Tenn. 1997) (internal quotations omitted). Certainly, following federal precedent in this context does not require overruling a settled development of state constitutional law. To the contrary, refusing to follow federal precedent here amounts to an implicit overruling or modification of a very recent state constitutional decision, namely Downey. Moreover, there are no linguistic differences justifying a distinct interpretation of the state constitutional provision in this context. Accordingly, the majority's decision is an unnecessary and unwarranted abandonment of the test recently adopted in Downey.

Moreover, my research reveals that the test adopted by the majority is without precedential support. I have found no decision requiring the State to offer specific proof that the safety threat from unlicensed drivers "invariably presents an imminent danger of death or serious bodily injury to other drivers that is not typically present with licensed drivers and that the magnitude of the problem commands heightened attention."

The majority's assertion that such specific proof is required by Downey is simply incorrect. This Court did not require the State to introduce specific proof on the risks posed by drunk drivers to establish the constitutional validity of sobriety checkpoints in Downey. We merely recognized the national statistics about the dangers and risks posed by drunk drivers. See, Downey, 945 S.W.2d at 110 (summarizing statistics quoted by the United States Supreme Court in Michigan v. Sitz, 496 U. S. at 456, 110 S. Ct. at 2488). Also erroneous is the majority's assertion that Downey requires the State to advance a "compelling" interest before analysis continues under the three-pronged test. While the adjective "compelling" was used in Downey to describe the public interest at stake in detecting and deterring drunk drivers, nowhere does Downey suggest that the State is required to advance a "compelling" interest to justify further analysis of the constitutionality of a suspicionless highway checkpoint. Indeed, the test adopted in Downey requires only a weighing of "(1) the gravity of the public concerns served by the roadblock; (2) the degree to which the roadblock advances the public interests; and (3) the severity of the roadblock's interference with an individual's liberty or privacy interest." Downey, 945 S.W.2d at 107. Of course, the "gravity" – strength or seriousness – of the public concern or State's interest will affect the weighing process, but no case, certainly not Downey, has required the State to establish a compelling interest as a threshold matter to continue the three-pronged analysis, as the majority opinion appears to require.[8]

---

[7](...continued)
that the Arkansas Supreme Court may not interpret the United States Constitution to provide greater protection than the United States Supreme Court's own federal constitutional precedents provide).

[8]Interestingly, the majority attempts to limit the showing it adopts to suspicionless, non-emergency investigatory roadblocks and attempts to distinguish fixed weigh-and-inspection stations established by statute. With

(continued...)

-5-

In my view, proper application of the three-pronged balancing test adopted in Downey results in a finding that license checkpoints are not per se unconstitutional. With respect to the first factor, the gravity of the public concern, I again note that the United State Supreme Court and many other state courts, including the Court of Criminal Appeals, have recognized that states have a "vital interest" in ensuring highway safety by removing unlicensed drivers from the roadways.[9] "Automobile licenses are issued periodically to evidence that the drivers holding them are sufficiently familiar with the rules of the road and are physically qualified to operate a motor vehicle." Prouse, 440 U.S. at 658, 99 S. Ct. at 1398. Persons who are too young to drive pose a threat to public safety. See Orr, 745 N.E.2d at 1040-41. Persons who have had their licenses suspended for driving under the influence convictions or traffic offenses often disregard the suspension and drive anyway, endangering the public. Id. In short, the State has a critical interest in protecting its citizens from drivers who either are not qualified to drive or have been forbidden to drive because of a record of driving offenses. Id. at 1041.

With respect to the second factor, the degree to which the checkpoint advances the public interest, it seems obvious that there is no better way, indeed no other way, to advance the public interest in detecting unlicensed drivers than license checkpoints. As the New Hampshire Supreme Court has recognized, license checkpoints are "the only effective means available to law enforcement authorities of enforcing the license and registration laws." Koppel, 499 A.2d at 980. Moreover, the Ohio Supreme Court has recognized:

> [c]ompounding the danger to the public from unlicensed drivers is the fact that much of the danger is hidden from plain view. While many types of dangerous motorists – drunk drivers, for example – exhibit erratic driving, the unlicensed driver often displays no observable characteristics. Police officers on roving patrol cannot pull over a vehicle for the sole purpose of checking the driver's license and registration. Therefore, without checkpoints, the only way in which police can identify an unlicensed driver is by waiting for the driver to commit a driving offense. In at least some instances, the offense would not even have occurred had the offending driver been detected earlier and been removed from the roadways.

Orr, 745 N.E.2d at 1040-41.

---

[8](...continued)

all due respect, this is a distinction without a difference. Certainly the state's interest in keeping unlicensed drivers off the roadways is just as great, if not greater, than the interest protected by the weigh-and-inspection stations established by statute. Furthermore, I know of no principle of law that suggests suspicionless stops authorized by statutes are subject to less intensive constitutional scrutiny than other suspicionless stops. In fact, the United States Supreme Court decision in Brown, which struck down a Texas statute that was applied to authorize suspicionless detentions, would seem to suggest that there is no constitutional difference between suspicionless stops authorized by statute and those initiated without a statute. See, Brown, 443 U.S. at 53, 99 S. Ct. at 2640.

[9] Prouse, 440 U.S. at 658, 99 S. Ct. at 1398; Hagy, 1995 WL 712355, *2.

The third and final factor for consideration is the severity of the checkpoint's interference with an individual's liberty or privacy interest. License checkpoints constitute only a minimal interference with an individual's liberty interest. The detention is brief, and, if conducted in accordance with appropriate administrative guidelines, individuals suffer little or no subjective anxiety because the checkpoint will be publicized, signs announcing the checkpoint will be conspicuously placed on the highway, and officers will immediately advise individuals as to the purpose of the checkpoint.

Therefore, after weighing these competing interests, as required by the analysis adopted in Downey, I am of the opinion that license checkpoints are not unconstitutional per se. Such checkpoints may be administered in an unconstitutional manner when supervisory approval of the location and time of the checkpoint is not sought, and/or the checkpoint is not conducted in accordance with administrative guidelines limiting the conduct and discretion of officers in the field.

In Downey, we emphasized the importance of supervisory control over site selection and operation of sobriety checkpoints. While I dissented in Downey from the majority's conclusion that the evidence failed to establish supervisory and administrative approval of the sobriety checkpoint, after reviewing the record in this case, I am convinced that the evidence fails to establish supervisory and administrative approval of this license checkpoint.[10]

Lieutenant Hill initially testified that he established this roadblock at the direction of his supervisors pursuant to Department of Safety General Order 410, that others had operated roadblocks at this location during the week preceding October 11, 1997, and that he therefore had assumed others had taken the necessary steps to ensure the roadblock complied with General Order 410. However, counsel for Hicks offered documentary evidence from the Department of Safety showing that no roadblocks had been operated at this location prior to those operated by Lieutenant Hill. Also significant is Lieutenant Hill's uncertainty as to why officers from Red Bank and the City of Chattanooga participated in the checkpoint and who summoned them. Unlike Downey, where I viewed the participation of officers from three different jurisdictions as evidence of prior administrative and supervisory approval, Lieutenant Hill's testimony in this case reveals that the multi-jurisdictional participation resulted from mere coincidence rather than advance planning.

In addition to the lack of supervisory approval, Hicks offered proof to show that this checkpoint failed in other ways to follow the guidelines established in Downey. For example, this checkpoint had not been previously publicized, no signs were placed on the road indicating the location and imminency of the checkpoint, motorists were not advised of the purpose of the roadblock, and officers were not using red batons or wearing orange vests as required by General Order 410. Simply stated, the evidence in this record supports and does not preponderate against the trial court's finding that this roadblock was administered in an unconstitutional manner under this Court's decision in Downey. Accordingly, I agree that the Court of Criminal Appeals erred in reversing the trial court's decision granting the defendant's motion to suppress.

_____

[10]Interestingly, Lieutenant Hill operated the sobriety checkpoint which resulted in our decision in Downey.

## Conclusion

For the reasons herein stated, I dissent from the analysis employed by the majority, but I agree with the majority's conclusion that the Court of Criminal Appeals erred in reversing the trial court's judgment granting the defendant's motion to suppress.

_____
FRANK F. DROWOTA, III, JUSTICE