IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 117,496

STATE OF KANSAS,
*Appellee*,

v.

BRIAN JOSHUA LUTZ,
*Appellant*.

SYLLABUS BY THE COURT

1.

Appellate courts employ a two-part process when reviewing a district court's decision on a motion to suppress evidence. The district court's factual findings are reviewed to determine if they are supported by substantial competent evidence while the legal conclusions drawn from the factual findings are reviewed using a de novo standard.

2.

Deference in appellate review is not to a particular witness but to the fact finder who weighed and evaluated the evidence.

3.

The tolerable duration of police inquiries in the traffic stop context is not based on any rule of thumb about the minutes required for a 'routine' stop, but is determined by the time required to complete the tasks involved in processing the mission of the traffic stop in question and to attend to related safety concerns. Officers may take reasonable and necessary precautions for their safety so long as such measures are not unduly burdensome under the circumstances.

4.

The time involved in calling and waiting for backup officers was "negligibly burdensome" given the circumstances present in this case.

5.

The actions of the officers here, including calling for a drug dog, did not measurably extend the duration of the traffic stop beyond the time necessary to achieve the stop's basic objective of processing the observed traffic violation.

Review of the judgment of the Court of Appeals in an unpublished opinion filed June 15, 2018. Appeal from Shawnee District Court; DAVID DEBENHAM, judge. Opinion filed November 6, 2020. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Clayton J. Perkins,* of Capital Appellate Defender Office, was on the briefs for appellant.

*Natalie Chalmers,* assistant solicitor general, and *Derek Schmidt,* attorney general, were on the briefs for appellee.

The opinion of the court was delivered by

WARD, J.: Brian Lutz was the front seat passenger in a vehicle stopped by Topeka police officers early one morning for a traffic violation. The vehicle was coming from the location of a suspected drug transaction. Backup officers and a canine officer were requested to the scene of the stop and arrived shortly. A trainee officer at the scene was tasked with writing a warning citation to the driver while other officers began removing the vehicle's occupants to facilitate a drug dog sniff. As Lutz was stepping from the passenger side of the vehicle, drug paraphernalia was observed in his immediate vicinity. The dog sniff was called off before it began. A warrantless probable cause search of the vehicle disclosed controlled substances.

Lutz was charged with possessing marijuana, methamphetamine, and drug paraphernalia. He moved to suppress the seized evidence arguing that the initial stop of the vehicle was without sufficient legal justification. He also argued that officers detained occupants of the vehicle longer than lawfully permitted to accommodate the planned drug dog sniff of the vehicle. The motion to suppress was heard and denied by the district court. That decision was affirmed by a panel of the Court of Appeals. We likewise affirm the district court's denial of the suppression motion.

PROCEDURAL HISTORY OF THE CASE

*Hearing on Motion to Suppress*

An evidentiary hearing on defendant's motion to suppress was held in the Shawnee County District Court. Three of the police officers involved in the case provided the following testimony. No other evidence was presented.

Just before 3 a.m. on April 23, 2015, Topeka, Kansas police officers Brandon Austin and Scott Sinsel began surveilling a home in Topeka in response to a citizen complaint about vehicles, bicycles, and pedestrians coming and going for short periods of time from the suspect residence at all hours of the night. Austin had been with the department over six years. He was experienced in drug investigations and was assigned as field trainer for Sinsel who was a "young recruit officer" riding along with him.

Austin parked the patrol vehicle some distance from the residence. He observed a vehicle and bicycle come to the house and not leave. He then observed a second vehicle arrive at the house, stay for "about a minute," and leave. Suspecting a possible drug transaction, Austin followed the departing vehicle to a Kwik Shop where the vehicle stayed for less than five minutes and then left. He continued to follow the car for several

miles and watched it move from one clearly designated eastbound lane of 29th street in Topeka into the other eastbound lane of 29th street without signaling the change of lanes.

Based on this observed traffic violation, Austin initiated a traffic stop at 3:23 a.m. by activating emergency lights. The vehicle was a 2007 black Buick 4-door with a temporary tag. It slowed as if to stop but continued for a while before finally coming to a complete stop in a bank parking lot. Because the Buick had three occupants, Austin called for backup officers before he and Sinsel got out of the patrol car. He then went to the driver side of the Buick. Sinsel went to the passenger side. The front seat passenger was the defendant, Brian Lutz. The officers noticed that Lutz was not wearing a seat belt as he sat there. Austin was familiar with Lutz. He had investigated a shooting at Lutz' residence that occurred within the last two months. And he was aware of a very recent traffic stop involving Lutz, marijuana, and a gun.

The occupants of the vehicle were told to put their hands where officers could see them. They did so without incident. Austin collected identifying information from the driver. Sinsel collected the same from Lutz. The occupants were told to stay in their car while the two officers went back to the patrol car to run identifying information on the driver and Lutz. There were no wants or warrants on either person. While in the patrol car and still awaiting the arrival of backup officers, Austin called for a drug dog because of the nature of the stop and his previous knowledge of Lutz. The canine handler, Officer Michael Ahlstedt, was one block away at the time.

The process of stopping the vehicle, calling for backup, approaching the vehicle, speaking with the driver, gathering identification information from the driver and front seat passenger, going back to the patrol car, running wants and warrants, and calling for the drug dog, all occurred within a span of seven to eight minutes. The last three minutes or so of this timeframe were spent obtaining information regarding the driver and front seat passenger.

4

Backup officers Lee Trout and Kelsey Krogmann arrived on scene in separate police vehicles near the end of this seven to eight minutes. They were briefed by Austin regarding the identity of the driver and front seat passenger. He told them he had called for a drug dog and that the canine handler was on his way. Austin told Sinsel at this time to return to the patrol car and begin writing a warning citation to the driver for the lane change violation. Sinsel complied with Austin's request.

It was about this time, just after the eight-minute mark, that officer Michael Ahlstedt arrived with the drug dog. He asked officers on scene to have all occupants removed from the vehicle so that his canine could perform a sniff of the vehicle safely, without occupant interference. Austin would deal with the driver, Trout the front seat passenger, and Krogmann the backseat passenger.

Austin approached the driver, explained the drug dog search to her, and told her that "if everything checks out" she would likely receive a traffic warning citation and be free to leave. He escorted her back to the patrol car. Trout approached Lutz and had him get out of the front passenger seat. When Lutz did so, Trout observed in plain view an item of drug paraphernalia (marijuana grinder) in the pocket of the front passenger door. He immediately alerted Austin that he had found the item. Having discovered the drug paraphernalia, officers concluded they had probable cause to search the vehicle and terminated the drug dog sniff before it even began.

The subsequent warrantless search of the vehicle disclosed additional items of suspected drug paraphernalia as well as suspected controlled substances. Sinsel was still in the patrol car writing the warning citation and observed that the vehicle occupants were placed in handcuffs after being removed from the car. He knew something had occurred, but he was not sure what.

According to Austin, the total time that elapsed from the stop of the suspect vehicle until the time Trout observed drug paraphernalia in the passenger door pocket was "less than 12 minutes." It was at or shortly after the eight-minute mark that Sinsel began writing the warning citation as directed. Austin estimated that it takes him from 10-15 minutes to complete the writing of a traffic citation following a car stop, generally closer to 10 minutes. He estimated that Sinsel, an officer in training, finished with the warning citation in this case approximately 12-13 minutes after the initial traffic stop.

*District Court Ruling on Motion to Suppress*

Following review of the suppression hearing testimony, the district court announced its findings of fact and legal conclusions. The court detailed the testimony of the officers given at the suppression hearing. It then addressed the two legal issues raised by Lutz in his motion to suppress, namely whether the officers had a sufficient legal basis to make the initial traffic stop, and whether the officers unlawfully extended the duration of the traffic stop beyond its underlying objective.

Regarding the basis for the traffic stop, the district court concluded that "the officers had the required lawful basis for stopping the Buick automobile." Even though the court noted that the stop may have been pretextual (suspicion of drug activity), it concluded the stop was nonetheless properly based upon an observed traffic law violation (improper lane change) and thus grounded in reasonable suspicion of criminal activity. Citing *State v. DeMarco*, 236 Kan. 727, 952 P.2d 1276 (1998), *State v. Jones,* 300 Kan. 630, 639, 333 P.3d 886 (2014), and K.S.A. 22-2402(1).

Turning to the question of whether the traffic stop was unlawfully extended to accommodate the drug dog sniff, the district court analyzed the rule of law from *Rodriguez v. United States*, 575 U.S. 348, 350, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015), which states that an unconstitutional seizure occurs when law enforcement

officers extend a traffic stop longer than necessary to effectuate the purpose of the stop, i.e., the processing of the underlying traffic violation. The district court concluded the traffic stop was not unlawfully extended by the planned drug dog sniff and denied the motion.

*Court of Appeals Decision*

In an unpublished decision a panel of the Court of Appeals affirmed the district court's denial of Lutz' motion to suppress. *State v. Lutz*, No. 117,496, 2018 WL 2999228, at *1 (Kan. App. 2018) (unpublished opinion). The panel outlined the factual and procedural history of the case. It found that substantial competent evidence supported the district court's findings. The panel then concluded:

"Because the traffic stop was not prolonged due to the dog sniff, the officers did not violate Brian's constitutional rights by beginning the dog sniff process—removing him from the car. See *Rodriguez*, 135 S. Ct. at 1616; *Caballes*, 543 U.S. at 409 (holding dog sniff of exterior of car during lawful seizure does not implicate legitimate privacy interests); *Maryland v. Wilson*, 519 U.S. 408, 414-15, 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997) (holding officers can remove vehicle occupants from car pending completion of traffic stop). The subsequent search of the vehicle was lawful based on Trout viewing the marijuana grinder. See *State v. Sanchez-Loredo*, 294 Kan. 50, 55, 272 P.3d 34 (2012) (noting plain view is a recognized exception to warrant requirement); *State v. Harrington*, 2 Kan. App. 2d 592, 593-94, 585 P.2d 618 (1978) (plain view of marijuana justified warrantless search)." 2018 WL 2999228, at *3.

ANALYSIS

*Standard of Review*

The burden is on the State to prove the lawfulness of a search and seizure. K.S.A. 22-3216(2). Appellate courts employ a two-part process when reviewing a district court's decision on a motion to suppress evidence.

The district court's factual findings are reviewed to determine if they are supported by substantial competent evidence. Appellate courts do not reweigh the evidence, assess witness credibility, or resolve evidentiary conflicts. *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018). Deference is not to a particular witness but to the fact-finder who weighed and evaluated the evidence. *State v. Lowery*, 308 Kan. 359, 367, 420 P.3d 456 (2018).

The legal conclusions drawn from the factual findings are reviewed using a de novo standard. *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018).

*Discussion*

Several issues were raised by Lutz before the district court and the Court of Appeals, but the sole issue remaining for this court's consideration is whether the officers unlawfully extend the duration of the traffic stop beyond the time needed to fulfill its underlying objective and thus violated the rule of law announced in *Rodriguez.*

A routine traffic stop is a seizure under the Fourth Amendment. *DeMarco*, 263 Kan. at 733; *Jones*, 300 Kan. at 637. It is a form of investigative detention which must be supported from its inception by articulable reasonable suspicion of criminal activity. *State v. Jimenez,* 308 Kan. 315, 323, 420 P.3d 464 (2018); see *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). The scope of the traffic stop "must be strictly tied to and justified by the circumstances which rendered its initiation proper." *State v. Damm,* 246 Kan. 220, 224, 787 P.2d 1185 (1990).

The United States Supreme Court has said, "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S. Ct. 834, 160 L. Ed 2d 842 (2005). Later in *Rodriguez* that Court

explained that the "tolerable duration" of police inquiries in the traffic stop context is not based on any rule of thumb about the minutes required for a 'routine' stop. Instead it is determined by the time required to complete the tasks involved in processing the mission of the traffic stop in question, and to attend to related safety concerns. "Authority for the seizure ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." 575 U.S. at 354.

Following the *Rodriguez* decision, this court held in Jimenez that an officer's detailed questions into the travel plans of a motorist measurably and unlawfully extended the duration of the traffic stop and was not supported by any reasonable suspicion or probable cause of other criminal activity. This court noted that beyond simply determining whether to issue a citation, a law enforcement officer's mission in a traffic stop typically includes checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. Officers may also take "negligibly burdensome precautions" for their safety. 308 Kan. at 316-17 (citing *Rodriguez*, 575 U.S. at 356).

In the case before us the district court found from the suppression hearing testimony that 12 minutes elapsed from the initial vehicle stop at 3:23 a.m. until the vehicle's occupants were asked to exit the car. The court recited Officer Austin's estimation that it would take Officer Sinsel 12-13 minutes to complete writing the traffic citation. The court found that Officer Sinsel began writing the citation about eight minutes into the stop and "was still in the process of writing out the citations when the occupants were asked to step out of the car."

The district court then concluded:

"Overall, the time between the stop and plain view of the illegal contraband was a short period of time. The actions of the officers, including Officer Ahlstedt and Officer Trout, to this

9

point, did not prolong or extend the duration of the original traffic stop any further than what was necessary to complete the investigation for the traffic violations and issue citations for the traffic violations."

The district court's factual findings are a fair interpretation of the record made at the suppression hearing. Although there may be differing ways to view the record below, substantial competent evidence supports the district court's findings, and those findings support the legal conclusions reached by the district court.

From the initiation of the traffic stop at 3:23 a.m. until the moment when Officer Trout observed drug paraphernalia in plain view next to Lutz, the stop was not measurably extended beyond its basic objective of processing the observed traffic violation. Calling for and waiting for backup officers was both reasonable and necessary given the time of morning, the relative inexperience of one of the two officers, the greater number of occupants in the car than officers on scene at the time, and Officer Austin's knowledge of previous incidents involving Lutz in which firearms were discharged or were present. The limited time involved in securing this assistance was not unduly burdensome under the circumstances. The two backup officers arrived within minutes of being summoned. The brief discussion and coordination between the various officers ensured that each officer understood the circumstances of the stop, the identity of the stopped vehicle's occupants, and the next steps to be taken.

A dog sniff of the exterior of an automobile during an otherwise lawful traffic stop does not implicate legitimate privacy interests and is not a search subject to the Fourth Amendment. *Caballes*, 543 U.S. at 409; *United States v. Jacobsen*, 466 U.S. 109, 123-24, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984); *State v. Barker*, 252 Kan. 949, 957, 850 P.2d 885 (1993). Removal of the vehicle's occupants, including passengers, is permitted pending completion of the traffic stop. *Maryland v. Wilson*, 519 U.S. 408, 414-15; 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997).

Even given the district court's conclusion that officers lacked sufficient reasonable suspicion of drug activity to extend the traffic stop, utilization of a drug dog during the stop was nonetheless lawful. As noted above, the district court found here that "[t]he actions of the officers . . . did not prolong or extend the duration of the original traffic stop any further than what was necessary to complete the investigation for the traffic violations and issue citations for the traffic violation." See *Rodriguez*, 575 U.S. at 356.

Giving appropriate deference to those findings brings us to the conclusion that the district court did not err in denying the motion to suppress.

CONCLUSION

The decision of the district court denying the motion to suppress is affirmed. The judgment of the Court of Appeals is affirmed.

MICHAEL E. WARD, Senior Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** Senior Judge Ward was appointed to hear case No. 117,496 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court by the retirement of Chief Justice Lawton R. Nuss.