NOT DESIGNATED FOR PUBLICATION

No. 122,409

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee,*

v.

KENNETH MANN SHIMER,
*Appellant.*

MEMORANDUM OPINION

Appeal from Geary District Court; MARITZA SEGARRA and COURTNEY D. BOEHM, judges. Opinion filed September 24, 2021. Affirmed.

*Rick Kittel*, of Kansas Appellate Defender Office, for appellant.

*Tony Cruz*, assistant county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BRUNS, P.J., GARDNER and CLINE, JJ.

PER CURIAM:  Kenneth Mann Shimer appeals his convictions of several drug charges. Following his convictions, Shimer was sentenced to a controlling term of 52 months' imprisonment, a downward durational departure from the presumptive sentence. On appeal, Shimer contends that:  (1) the district court erred in failing to suppress evidence—including a large amount of marijuana—found in the rental car he was driving; (2) the State denied his statutory and constitutional right to a speedy trial; and (3) the evidence was insufficient to support his conviction on the charge of conspiracy to possess marijuana with the intent to distribute. For the reasons set forth in this opinion, we affirm Shimer's convictions.

1

FACTS

This case arises out of a traffic stop of a rental car travelling on I-70 in Geary County on May 15, 2015. The car was being driven by Kenneth Mann Shimer, and Christine Gilbeau-Braum was a passenger. During the stop, a drug-detection dog alerted to the presence of drugs in the car. Based on the canine alert and indication, law enforcement officers searched the rental car and found more than 60 pounds of marijuana sealed in packages located in six suitcases and duffle bags in the trunk. In addition, the officers found a jar containing marijuana in the center console between the driver and the passenger.

The State initially charged Shimer with possession of marijuana with intent to distribute, no drug tax stamp, conspiracy to possess marijuana with the intent to distribute, and possession of marijuana. On May 18, 2015, Shimer posted a $100,000 bond, waived extradition, and returned to Myrtle Beach, South Carolina, with orders to return for the next status hearing set for June 2015.

Prior to trial, Shimer filed multiple motions, including several motions to suppress the evidence found during the search of the rental car he was driving. In the motions to suppress, Shimer claimed: (1) the traffic stop was not supported by reasonable suspicion; (2) the traffic stop was improperly extended beyond its original purpose; and (3) the drug sniff was not reliable. The district court denied Shimer's motions to suppress, and a jury ultimately convicted Shimer on three of the charges. The other charge had been dismissed by the State before submission of the case to the jury.

*Motion to Suppress Hearing*

The district court held a suppression hearing over the course of two days in August and December 2017. The first portion of the hearing was held on August 3, 2017. At that time, the State presented the testimony of Junction City Police Officer Nicholas Blake. The State also presented the testimony of Edward Van Buren, the dog trainer who trained the canine that performed the drug sniff in the case. Moreover, the defense presented the testimony of Steve Nicely—who is also a dog trainer—and Shimer. Because the hearing could not be completed on that day, it was recessed until December 7, 2017. When the hearing continued, the State recalled Officer Blake as a rebuttal witness.

Officer Blake testified that he was sitting in his patrol vehicle in the median of I-70 at mile marker 305 in Geary County around 10:05 a.m., when he saw a westbound car that he believed was following another car too closely. Officer Blake pulled onto the interstate and headed west to catch up to the car. However, when he got into a better position to see the car, he determined that there was no violation.

According to Officer Blake, he then observed another car—a red Ford Taurus with a Washington license plate—travelling eastbound on the other side of the median. The officer testified that he suspected that the car was driving in the left lane with no reason to do so. As such, Officer Blake turned his patrol vehicle around and pursued the car. By the time the officer caught up with the car, it was travelling in the in the right lane. Officer Blake initiated a traffic stop and identified Shimer as the driver. In addition, the officer identified Gilbeau-Braum as the passenger. Both are residents of South Carolina.

At the suppression hearing, the State introduced a video of the traffic stop into evidence that showed the events leading up to and during the traffic stop. The record reflects that the district court reviewed the video and took it into consideration in ruling on Shimer's motions to suppress. As confirmed by the video, Officer Blake first saw the

car driven by Shimer travelling eastbound in the left lane of traffic. There were other vehicles in the area and the officer passed several of them in the approximately two minutes it took for him to catch up to Shimer's car. From the time he turned his patrol vehicle around to head east, Officer Blake travelled about three miles to catch up to the car Shimer was driving.

Officer Blake testified that in order for a passing vehicle at interstate highway speeds to move safely back into the right lane of traffic, it needs to be three or four seconds ahead of the vehicle it is passing. Although Officer Blake was asked at the suppression hearing if he saw Shimer's car pass a semi-truck that can be seen in the video, he could not recall. However, he assumed that it had done so based on his review of the video.

The video confirms that Officer Blake initially contacted Shimer at 10:08 a.m. The officer told Shimer he stopped him because he was driving in the left lane, and he told him that it was for "passing only." In response, Shimer simply said: "Okay." After Officer Blake obtained Shimer's driver's license and vehicle documents—including a rental agreement—he asked Shimer if he would join him in his patrol vehicle while he checked his information. After originally agreeing, Shimer asked if he was being detained, and the officer told him that he was being detained for the traffic violation. At that point, Shimer told the officer that he wanted to remain in the car, and the officer told him that it was fine if he wanted to stay in his own vehicle.

When Officer Blake asked him what brought them this way, Shimer responded that he and Gilbeau-Braum were on their honeymoon. Although the officer did not know it at the time, Shimer's answer was not true. In fact, Shimer would later claim in his pretrial motions—and continues to claim on appeal—that he was not in a romantic relationship with Gilbeau-Braum notwithstanding his statement to the officer during the traffic stop.

4

According to Officer Blake, both Shimer and Gilbeau-Braum appeared to be "extremely nervous," and he testified that "he could see their pulses pounding in their carotid arteries." Moreover, the officer testified that Gilbeau-Braum's hand was shaking when she handed him the rental agreement. Although Officer Blake acknowledged that it is not unusual for someone to be nervous when pulled over by a law enforcement officer, he testified that he found the nervousness displayed by Shimer and Gilbeau-Braum to be beyond what he normally sees in someone during a traffic stop.

Upon reviewing the rental agreement, Officer Blake discovered that the car had been leased in Seattle, Washington, on May 11, 2015, for a one-way trip to Myrtle Beach, South Carolina. Additionally, the rental agreement showed that the car was to be returned on May 18, 2015. The officer testified that it was common for drug traffickers to use a one-way car rental to transport drugs. Officer Blake also testified that he believed that Shimer was driving the rental car "off route" based on an app on his cellphone that showed the shortest route from Seattle to Myrtle Beach would be to take I-90 and other interstate highways in the northern part of the United States.

After speaking with Shimer, Officer Blake returned to his patrol vehicle and started writing a warning citation for improperly driving in the left lane of a highway in violation of K.SA. 2014 Supp. 8-1522(c). While filling out the paperwork, the officer made a phone call to the El Paso Intelligence Center (EPIC) in an attempt to obtain additional information. According to Officer Blake, EPIC has access to information that is unavailable to local dispatchers—including federal databases, border crossings, and immigration status. The video shows that Officer Blake placed the call to EPIC at 10:11 a.m.

After requesting information from EPIC, Officer Blake placed them on hold and ran Shimer's information through dispatch. He then he got back on the phone with EPIC and waited for a response to his request for information. Before receiving responses from

5

EPIC or dispatch, Officer Blake decided to have his canine partner, Barney, perform a drug sniff on the outside of the rental car while he was waiting. It is important to note that Barney was riding with the officer at the time of the traffic stop and did not have to be called to the scene.

The video shows that Barney began the drug sniff around the outside of the rental car at 10:16 a.m. Barney first ran a sweep around the car and alerted on the front passenger side. He then ran another sweep around the car and once again alerted—and indicated by sitting—by the front passenger side window. The video confirms that the drug sniff was completed less than a minute after it started at 10:16 a.m., which was 8 minutes after Officer Blake had made his initial contact with Shimer and Gilbeau-Braum. Assuming Barney's alert and indication was reliable—which will be addressed in the analysis section of this opinion—the officer had probable cause at that point to search the rental car.

At the suppression hearing, Officer Blake testified that he had been trained and certified as a canine handler for nine years. Likewise, he testified that Barney is certified through the Heart of America Police Dog Association to detect the odors of marijuana, methamphetamine, heroin, cocaine, and ecstasy. Officer Blake also testified that Barney had a 94% accuracy rate in the previous two years of training.

After Barney completed his drug sniff, Officer Blake put him back into his patrol vehicle and finished his phone call with EPIC. The video reflects that the officer's call to EPIC ended at 10:17 a.m., which was nine minutes after the officer first made contact with Shimer. Officer Blake then called for backup as a result of Barney's alert and waited to hear back from dispatch. The backup officer arrived on the scene around 10:19 a.m.

The video depicts that Officer Blake contacted dispatch on several occasions during the traffic stop in an attempt to get a response to his request for information.

Finally, Officer Blake suggested that dispatch merely check for active warrants on Shimer in order to speed up the process. Approximately 12 minutes after calling dispatch, Officer Shimer was informed that Shimer did not have any active warrants.

After hearing back from dispatch, Officer Blake informed Shimer that the dog had alerted, so he had probable cause to search the car. When Shimer did not cooperate, he was placed in handcuffs. In the trunk of the car, the officers found six pieces of luggage—a combination of suitcases and duffel bags—containing packages of what was later confirmed to be marijuana as well as dispensary items of suspected marijuana in a plastic bag. The officers also found a jar containing marijuana in the center console between where Shimer and Gilbeau-Braum had been. At that point, both Shimer and Gilbeau-Braum were placed under arrest.

At the suppression hearing, Edward Van Buren—who had trained Barney—testified regarding his training and experience as a criminal and interdiction dog trainer for law enforcement. Specifically, Van Buren testified that he was trained by the Nebraska State Patrol that utilized the Utah Post (UPOST) standards for police dog training. According to Van Buren, the UPOST standards mirror the Polizeischutzhundprufung (PSP)—which means Police Protection Dog Examination—standards developed in Germany and used extensively throughout the United States. Van Buren described how he trained Barney to detect certain drugs with odor memorization and by using diversion training.

The defense called Nicely as a witness to render opinions regarding Barney's reliability. Nicely—who resides in Texas—testified about his experience as a police dog trainer and handler. He also testified about other cases in which he testified. Nicely testified that he had reviewed three years of Barney's training records and had viewed the video of the drug sniff in this case.

Nicely opined that the records kept on Barney's training and performance in the field were deficient because they did not contain sufficient information to allow an independent party to perform an analysis. In Nicely's opinion, Barney was not well trained. Although Nicely testified that he believed Officer Blake had improperly cued Barney during the drug sniff, he could not point to any specific instances on the video. Nevertheless, Nicely rendered the opinion that Barney's alert and indication were not reliable.

On cross-examination, Nicely admitted that he has been found not to be a credible witness by several courts in the past. In addition, Nicely admitted that he had testified 111 times regarding drug sniffs, and each time he had rendered the opinion that the sniff was not reliable. Furthermore, Nicely acknowledged that in each of the 111 cases, he testified to the same four factors: (1) the training standards for the drug detection dog were not sufficient; (2) the dogs were not properly trained; (3) the handlers were not properly trained; and (4) the handlers cued the dogs to alert.

Nicely also admitted that drug canine organizations have not adopted the behavioral science standards that he promotes. Further, he acknowledged that he is unaware of the legal standard for establishing probable cause by a drug-detection canine in Kansas. In an attempt to rehabilitate his testimony, Nicely pointed out on redirect that his curriculum vitae suggests that he had occasionally advised defense counsel that a drug detection dog had been properly trained.

In addition to presenting the testimony of Nicely, Shimer also testified on his own behalf at the suppression hearing. Shimer suggested that the video showed that he was passing a semi-truck at the time Officer Blake believed he was improperly driving in the left-hand lane. Shimer—whose testimony was limited to the allegation that he was improperly driving in the left lane—testified that although it could not be seen on the

video, he moved back into the right lane of traffic after he saw the semi-truck in his rearview mirror.

When the suppression hearing resumed on December 7, 2017, the State presented Officer Blake as a rebuttal witness. He testified that Barney was certified by the Heart of America Police Dog Association. He also answered questions about Barney's training records. Officer Blake testified that Barney does not alert or indicate every time that he is deployed. Moreover, he testified that Barney's accuracy rate has always been above 90%. After the parties rested, the district court heard the closing arguments of counsel before taking the matter under advisement.

On February 7, 2018, the district court issued a memorandum decision denying Shimer's motions to suppress. In rejecting the arguments made by Shimer, the district court determined that Officer Blake had a reasonable and articulable suspicion that Shimer had committed a traffic violation that justified the traffic stop. The district court also determined that Officer Blake did not improperly extend the traffic stop by running an EPIC check. The district court noted that the EPIC check only took 6 minutes while the dispatch check took 20 minutes.

In addition, the district court noted that Officer Blake had multitasked by running both checks as he was writing the warning ticket. In concluding that there was probable cause for the search of the rental vehicle driven by Shimer, the district court found that Barney had been properly trained and that his alert and indication were sufficiently reliable to justify the search. Moreover, the district court specifically found Nicely's opinion testimony to be unpersuasive. Subsequently, the district court denied a motion to reconsider filed by Shimer.

*Motion to Dismiss*

On December 15, 2017, Shimer filed a motion to dismiss in which he alleged that the State had violated his statutory and constitutional right to a speedy trial. In response, the State asserted that Shimer had waived his right to a speedy trial and, in the alternative, moved to have the district court assess nearly all of the delays in bringing the case to trial to him. In denying the motion to dismiss, the district court found that the defense had caused many of the delays by filing numerous pretrial motions in a piecemeal fashion. Additionally, the district court found that Shimer had voluntarily waived his right to a speedy trial.

In reviewing the record, the district court noted that Shimer's preliminary hearing and arraignment had originally been set for February 8, 2016. However, the defense asked for a continuance to April 18, 2016. Due to the unavailability of defense counsel for an earlier trial date, the district court set the case for a jury trial to begin on September 20, 2016. Nevertheless, the defense sought another continuance in order to file pretrial motions.

At a hearing held on September 1, 2016, the district court accepted Shimer's voluntary waiver of his speedy trial rights on the record. At a status conference held on October 13, 2016, the district court noted that it was still receiving motions from the defense despite the fact that the deadline for motions had passed. The suppression hearing was originally scheduled for January 8, 2017, but it was continued at the request of the State—and without objection by Shimer—due to the unavailability of a material witness.

On April 13, 2017, all of the parties appeared at the suppression hearing. However, Nicely—who was the primary witness for the defense—was evidently stuck in a Dallas airport. As a result, the suppression hearing was reset to commence on August 3, 2017, to accommodate the schedule of the witnesses. Unfortunately, the parties could not

complete the hearing on that day, and it was recessed until December 7, 2017. On that date, the district court set the jury trial to begin on February 26, 2018. However, defense counsel advised the district court that he may have another pretrial motion to file prior to trial. In response, the district court reluctantly gave the defense until December 15, 2017, to file any additional motions.

At the February 7, 2018, hearing, the district court denied Shimer's motion to dismiss, finding that he had previously waived his right to a speedy trial. Later that day, Shimer moved for another continuance of trial date. The district court compared calendars with counsel and determined that the next possible trial date would be in June. The district court then asked Shimer on the record if he wanted to continue his jury trial until June and he responded "Yes." Accordingly, the jury trial was reset to begin on June 25, 2018.

On the date that the jury trial was set to begin, the parties appeared before a different district judge who was filling in for the judge who was handling the case. Defense counsel advised the district court that it had filed a motion to reconsider the denial of his client's motion to suppress based on new caselaw. As such, the trial was continued yet again and a hearing on the motion to reconsider was set for August 21, 2018. Ultimately, on September 11, 2018, the district court denied Shimer's motion to reconsider.

*Jury Trial*

The jury trial finally began on September 24, 2018. Prior to trial, the district court granted Shimer a continuing objection to the evidence he had sought to suppress in order to preserve the issue for appellate review. At trial, the State presented the testimony of two witnesses—Officer Blake, and Kelly Woodward, who had been a latent fingerprint

11

examiner employed by the Kansas Bureau of Investigation when the evidence in this case was examined. In addition, the State introduced 25 exhibits into evidence.

The evidence presented at trial was mostly consistent with the facts recounted in the motion to suppress. In addition, Officer Blake testified that when a backup officer arrived, Shimer and Gilbeau-Braum were placed in handcuffs and the rental car was searched. During the search, six pieces of luggage—containing 61 packages of marijuana—were found in the trunk of the car. One of the six pieces of luggage contained both women's clothing and marijuana. Photographs of these items were admitted into evidence. Officer Blake testified that the numerous packages of marijuana that were seized were consistent with marijuana possessed with an intent to distribute.

After the marijuana was seized, six packages corresponding to each suitcase were sent to the KBA lab for testing. Four of the six packages were tested and found to be positive for the presence of THC, the active ingredient in marijuana. The net weight of the four packages of marijuana that were tested was between 450 grams and 30 kilograms.

Some of the exhibits admitted into evidence were photographs taken from Shimer's cellphone. One of the photos showed Shimer and Gilbeau-Braum hugging each other "inside an indoor marijuana grow" with planted vegetation in the background. A caption on the photograph said: "We have beautiful babies in Oregon." Another photograph taken from the cellphone showed "multiple rubber-banded bundles of U.S. currency laid on a table." The State also introduced photographs of the marijuana found in the luggage, and one of the pieces of luggage had an airline tag bearing the name of Gilbeau-Braum. A couple of the pieces of luggage were also marked with an airline tag and a bar code with the last name "Shimer."

In addition, the State called Woodward who testified about her training and experience with the KBI. Woodward testified that she examined the packages of marijuana that were seized in this case at the KBI lab. In doing so, she found two latent fingerprints that were sufficient to compare and attribute to a source. Woodward then compared the prints to the known fingerprints of Shimer and Gilbeau-Braum. One of the prints was a match to Shimer's finger, but the other print could not be attributed to a particular source. Thereafter, the State rested its case, and the defense presented no evidence.

Prior to the district court submitting the case to the jury, the State voluntarily dismissed one count of possession of marijuana filed against Shimer. Although the defense also moved to dismiss the charge of possession of marijuana with intent to distribute, the district court denied Shimer's motion and instead allowed the State to amend the charging document to conform with the evidence presented at trial. After deliberation, the jury found Shimer guilty of all three of the remaining counts.

On April 18, 2019, the district court denied Shimer's motion for a downward dispositional departure but granted him a downward durational departure. Consequently, Shimer was sentenced to 52 months in prison and 36 months of postrelease supervision. Thereafter, Shimer filed a timely notice of appeal.

ANALYSIS

*Denial of Motion to Suppress*

On appeal, Shimer first contends that the district court erred in denying his motion to suppress. His argument is three-fold: (1) he challenges the legality of the traffic stop; (2) he claims that the traffic stop was unlawfully extended; and (3) he asserts that there is insufficient evidence to support the district court's finding that the drug sniff performed

13

by the drug-detection dog was reliable. Accordingly, Shimer maintains that the law enforcement officers did not have probable cause to search the rental car that he was driving.

Under K.S.A. 22-3216(2), the State bears the burden to prove the lawfulness of the search and seizure. In reviewing the district court's decision on a motion to suppress, we apply a bifurcated standard. First, we review the factual underpinnings of the district court's decision to determine if they are supported by substantial competent evidence. Second, we review the ultimate legal conclusion reached by the district court de novo. See *State v. Cash*, 313 Kan. 121, 125-26, 483 P.3d 1047 (2021).

"'Substantial competent evidence is that which possesses both relevance and substance and which furnishes a substantial basis in fact from which the issues can reasonably be resolved.'" *State v. Sanders*, 310 Kan. 279, 294, 445 P.3d 1144 (2019). In reviewing a district court's factual findings for substantial competent evidence, we are not to reweigh the evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence. 310 Kan. at 294. We will address each of Shimer's arguments relating to the district court's decision on suppression under these standards.

### *Legality of the Traffic Stop*

The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Section 15 of the Kansas Constitution Bill of Rights contains similar language and provides "'the same protection from unlawful government searches and seizures as the Fourth Amendment.'" *State v. Ellis*, 311 Kan. 925, 929, 469 P.3d 65 (2020). Under the Fourth Amendment to the United States Constitution, the stop of a vehicle being driven always constitutes a seizure. *State v.*

14

*Cleverly*, 305 Kan. 598, 604, 385 P.3d 512 (2016). See *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979).

Under K.S.A. 22-2402, a law enforcement officer must have articulable facts sufficient to constitute reasonable suspicion in order to make a legal traffic stop. See *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). A traffic infraction provides an objectively valid reason to effectuate a traffic stop. *Cleverly*, 305 Kan. at 604. The question is not whether a traffic infraction was actually committed but whether an objectively reasonable law enforcement officer suspects that a violation has occurred based on his or her observations. *State v. Arceo-Rojas*, 57 Kan. App. 2d 741, Syl. ¶¶ 4, 5, 458 P.3d 272 (2020).

Here, Officer Blake testified that he stopped Shimer because he suspected he was driving in the left lane of a divided highway in violation of K.S.A. 2014 Supp. 8-1522. Subsection (c) of the statute provides:

> "(c) Upon a highway located outside the corporate limits of any city divided into two lanes of traffic proceeding in the same direction, all vehicles shall be driven in the right lane except when:
>
> (1) Overtaking and passing another vehicle;
> (2) preparing to make a proper left turn;
> (3) otherwise directed by official traffic-control devices; or
> (4) otherwise required by other provisions of law."

In addition to Officer Blake's testimony, the district court reviewed a video of the traffic stop that the State introduced into evidence at the suppression hearing. The video confirms that Shimer was driving in the left lane on eastbound I-70. Although a semi-truck can also be seen travelling eastbound in the right lane, it is a significant distance in front of the car driven by the defendant and Shimer does not appear to be overtaking or

passing the truck at that point. Moreover, Officer Blake testified that he did not believe that Shimer was driving in the left lane for a legitimate reason, and the district court found his testimony to be credible.

"The reasonableness of an officer's suspicion is based on the totality of the circumstances viewed from the perspective of a trained law enforcement officer. Reasonable suspicion arises from the combination of an officer's understanding of the facts and the relevant law." *City of Atwood v. Pianalto*, 301 Kan. 1008, Syl. ¶ 3, 350 P.3d 1048 (2015). Although Shimer has presented arguments that may constitute a valid defense if he were prosecuted for a violation of K.S.A. 2014 Supp. 8-1522, we find that based on our review of the record on appeal that Officer Blake articulated a reasonable suspicion of a traffic violation in order to stop the car being driven by Shimer.

We find this case to be similar to *United States v. Aispuro*, No. 13-10036-01-MLB, 2013 WL 3820017 (D. Kan. 2013) (unpublished opinion). In *Aispuro*, the United States District Court for the District of Kansas also considered the legality of a stop under K.S.A. 8-1522(c) in the context of a motion to suppress. Like the present case, the defendant in *Aispuro* claimed that he was travelling in the left passing lane on a highway that had passing lanes at specific intervals designed to allow motorists to pass another vehicle. The United States District Court concluded that the Kansas Highway Patrol trooper could have reasonably believed that the defendant's vehicle was merely following behind another vehicle and not passing it. Thus, the *Aispuro* court ruled that even if the trooper's suspicion was mistaken—or if there was reasonable doubt as to whether the defendant was passing or overtaking another vehicle—this would not render the traffic stop unreasonable or illegal.

As the *Aispuro* court explained:

16

"'An officer's objectively reasonable mistake of fact may support the reasonable suspicion . . . necessary to justify a traffic stop. That an officer's suspicions may prove unfounded does not vitiate the lawfulness of a stop, provided the officer's error was made in good faith and is objectively reasonable under the circumstances. Police errors, in this context, are simply unavoidable, as reasonable suspicion involves "probabilities" rather than "hard certainties." [Citation omitted.]'" 2013 WL 3820017, at *6.

Similarly, in the present case, even if Officer Blake was mistaken about the reason Shimer was travelling in the left lane on I-70, this does not invalidate the traffic stop. As the United States Supreme Court has held, a law enforcement officer's obligation is to be reasonable—not perfect. *Heien v. North Carolina*, 574 U.S. 54, 60, 135 S. Ct. 530, 190 L. Ed. 2d 475 (2014). Like the district court, we find the officer's decision to perform a traffic stop based on the information available to him to be within the realm of reason. Moreover, there is no evidence—or even an allegation—that Officer Blake acted in bad faith in stopping the car driven by Shimer.

Just last year, the United States Supreme Court explained that the reasonable suspicion standard required for a traffic stop is less stringent than what is required to establish probable cause. Reasonable suspicion "'depends on the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act.' [Citations omitted.]" *State v. Glover*, 589 U.S. ___, 140 S. Ct. 1183, 1188, 206 L. Ed. 2d 412 (2020). Likewise, the *Glover* court found that law enforcement officers should be allowed to make "'commonsense judgments and inferences'" when deciding whether reasonable suspicion exists to make a traffic stop, and they are not required to rule out innocent conduct. 140 S. Ct. at 1188.

Our review of the record reveals that Officer Blake testified that he suspected that Shimer was violating Kansas law when driving in the left lane of I-70 for no apparent reason. Although the video of Shimer's actions prior to being stopped are inconclusive regarding his intentions, it does confirm that he was driving in the left-hand lane with no

17

other vehicles in close proximity as articulated by the officer. We also find it significant that the district court—which heard the evidence presented at the suppression hearing—found Officer Blake's testimony to be credible. As discussed above, we are not to reweigh the evidence nor are we to make credibility decisions.

Under the totality of the circumstances, we conclude that Officer Blake articulated a reasonable suspicion that Shimer had violated K.S.A. 2014 Supp. 8-1522 and, as a result, the traffic stop was legal under the Fourth Amendment and section 15 of the Kansas Constitution Bill of Rights.

*Length of Traffic Stop*

Next, Shimer challenges the length of the traffic stop. Specifically, he contends that Officer Blake unreasonably extended the length of the stop due to the time it took to call EPIC. As the parties are aware, "[t]raffic stops must not be measurably extended beyond what is necessary to process the infraction prompting the stop, unless there is reasonable suspicion of or probable cause to believe there is other criminal activity . . . ." *State v. Jimenez*, 308 Kan. 315, 316, 420 P.3d 464 (2018) (citing *Rodriguez v. United States*, 575 U.S. 348, 355, 135 S. Ct. 1609, 191 L. Ed. 2d 492 [2015]). Based on our review of the record in the present case, we do not find evidence that the officer caused the traffic stop to be delayed, nor do we find evidence that his call to obtain additional information from EPIC caused any delay.

In denying Shimer's motion to suppress, the district court found that during the six minutes that it took for Officer Blake to receive information back from EPIC, he was conducting other appropriate tasks related to a traffic stop. This finding is confirmed by the video of the traffic stop, which shows that as soon as Officer Blake got back to his patrol vehicle with the documentation obtained from the occupants of the rental car, he briefly reviewed the documents, began writing the warning citation, and placed a call to

18

EPIC on his cellphone. After making his request for information, Officer Blake placed EPIC on hold and called dispatch on his radio. As soon as he was finished making his request to dispatch, the officer got back on the phone with EPIC while he waited for dispatch to report. At that point, EPIC did not yet have the requested information and Officer Blake decided to have Barney—who was already in his patrol vehicle—perform a drug sniff on the outside of the rental car.

It is appropriate for a law enforcement officer to make inquiries and to take action unrelated to the initial purpose of a traffic stop as long as they do not measurably extend or prolong the stop. See *State v. Coleman*, 292 Kan. 813, 816, 257 P.3d 320 (2011). Likewise, the running of an EPIC check during a traffic stop is permissible. See *United States v. Morales*, 961 F.3d 1086, 1092 (10th Cir. 2020). During a traffic stop, an officer can request a criminal history check without reasonable suspicion of criminal activity. *State v. DeMarco*, 263 Kan. 727, 734, 952 P.2d 1276 (1998); see *United States v. Lyons*, 510 F.3d 1225, 1235 (10th Cir. 2007), *cert. denied* 522 U.S. 1329 (2008) (an officer may temporarily detain a vehicle for a suspected traffic violation while requesting documentation, running a criminal history check, and issuing a citation).

Likewise, it is appropriate for a law enforcement officer to have a drug-detection dog do a drug sniff on the exterior of a vehicle during a lawful traffic stop. As the Kansas Supreme Court recently reiterated in *State v. Lutz*, 312 Kan. 358, 366, 474 P.3d 1258 (2020):

> "A dog sniff of the exterior of an automobile during an otherwise lawful traffic stop does not implicate legitimate privacy interests and is not a search subject to the Fourth Amendment. *Caballes*, 543 U.S. at 409, 125 S.Ct. 834; *United States v. Jacobsen*, 466 U.S. 109, 123-24, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984); *State v. Barker*, 252 Kan. 949, 957, 850 P.2d 885 (1993). Removal of the vehicle's occupants, including passengers, is permitted pending completion of the traffic stop. *Maryland v. Wilson*, 519 U.S. 408, 414-15, 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997).

"Even . . . [if] officers lacked sufficient reasonable suspicion of drug activity to extend the traffic stop, utilization of a drug dog during the stop was nonetheless lawful."

Shimer contends that Officer Blake somehow extended the traffic stop by placing the call to EPIC. However, the evidence—including the video of the stop—simply does not support this argument. Rather, the evidence shows that the call to EPIC did not extend the time of the traffic stop at all—much less impermissibly. In fact, dispatch did not provide Officer Blake with a partial return of information until nearly 10 minutes after the call with EPIC had ended. Of course, by the time EPIC responded, there was already probable cause to search the rental car based on Barney's alert and indication. Additionally, there is no evidence in the record—nor does Shimer allege—that Officer Blake did anything to cause dispatch to delay in responding to his request for information.

Shimer also argues that Officer Blake somehow extended the traffic stop by inquiring into his travel plans. Depending on the circumstances, it is not improper for a law enforcement officer to inquire about a driver's travel plans during a legal traffic stop. *State v. Schooler*, 308 Kan. 333, 354, 419 P.3d 1164 (2018); see *State v. Morlock*, 289 Kan. 980, 218 P.3d 810 (2009). In *Schooler*, our Supreme Court found that inconsistent or evasive answers to questions regarding a driver's travel plans may contribute to an officer's reasonable suspicion because "lies, evasions or inconsistencies about any subject while being detained may contribute to reasonable suspicion." 308 Kan. at 354 (quoting *United States v. Simpson*, 609 F.3d 1140, 1149 [10th Cir. 2010]). Thus, an officer's inquiry regarding a driver's travel plans during a lawful traffic stop is impermissible only if the questioning unlawfully extends the stop. See *Jimenez*, 308 Kan. at 324; *State v. Lowery*, 308 Kan. 359, Syl. ¶ 3, 420 P.3d 456 (2018).

Once again, a review of the record does not support Shimer's argument. Instead, the evidence—including the video of the stop—shows that Officer Blake only asked one

travel-related question as he was engaged in retrieving documents from the car's occupants. Accordingly, we conclude that the traffic stop was not extended—much less measurably extended—by Officer Blake placing a call to EPIC for information, having Barney conduct a drug sniff on the exterior of the rental car, or asking Shimer about his travel plans.

### *Reliability of Drug Sniff*

Shimer further contends that the district court should have granted his motions to suppress because the drug sniff was unreliable. As we have found in the previous section of this opinion, Officer Blake did not extend the traffic stop in this case by having Barney perform a drug sniff while waiting to receive the information requested from EPIC and dispatch. Nevertheless, Shimer challenges Barney's qualifications as well as the validity of the drug sniff performed in this case. After hearing the evidence on this issue—including the opinions rendered by the dog trainers called as witnesses at the suppression hearing—the district court found that Barney was qualified and that the drug sniff was reliable. We agree.

In order to establish probable cause for a law enforcement officer's search of a vehicle based on a canine alert, the State must provide foundational testimony regarding the dog's training, experience, and conduct from a witness qualified to interpret the dog's behavior as signaling the presence of a controlled substance. *State v. Horton*, 300 Kan. 477, 488, 331 P.3d 752 (2014); *State v. Barker*, 252 Kan. 949, 959-60, 850 P.2d 885 (1993). After this foundation is established, the factfinder may consider an alert by a drug-detection dog while performing a drug sniff on the exterior of a vehicle as sufficient to establish probable cause to search a vehicle "as long as there is some evidence that the K-9's behavior reliably indicates the likely presence of a controlled substance." *State v. Brewer*, 49 Kan. App. 2d 102, 110, 305 P.3d 676 (2013). See *Horton*, 300 Kan. at 488.

At the suppression hearing, the State laid the foundation regarding Barney's training, certification, reliability rate, and his behavior through the testimony of both Officer Blake and Edward Van Buren. As discussed above, Van Buren testified that he trained Barney in accordance with nationally recognized standards. In response, Shimer called Steve Nicely—a dog trainer from Texas—to render opinions both as to Barney's qualifications and as to the reliability of his drug sniff in this case.

After hearing the conflicting opinions rendered by Van Buren and Nicely—as well as the other evidence presented on this issue—the district court found Nicely's testimony to be unpersuasive. This finding is supported by evidence in the record that Nicely admitted under oath his opinion testimony had been found not to be credible by various courts. In particular, Nicely testified that he had testified in court 111 times and each time he had offered the opinion that the drug-detection dog was not properly trained and/or that the drug sniff was unreliable.

Additionally, Nicely admitted during his testimony that the so-called "behavior science practice" for training dogs that he relied on in rendering his opinions about Barney has not been adopted by law enforcement agencies or by courts. Although Nicely rendered the opinion that Officer Blake somehow cued Barney to alert, he could not point to anything specific on the video of this traffic stop—or in others that he had reviewed in which Barney had performed a drug sniff—that supported his opinion. Nicely also admitted that he was unaware of the legal standard in Kansas that allows probable cause to be established by a canine alert. See *Horton*, 300 Kan. at 488; *Barker*, 252 Kan. 949, Syl. ¶ 6; *United States v. Parada*, 577 F.3d 1275, 1282 (10th Cir. 2009) (upholding a canine alert during a drug sniff to establish probable cause to search a vehicle during a traffic stop).

Shimer cites *Florida v. Harris*, 568 U.S. 237, 246, 133 S. Ct. 1050, 185 L. Ed. 2d 61 (2013), in which the United States Supreme Court found that the best measure of a

drug-detection dog's reliability is revealed in a controlled testing environment. Nevertheless, we find nothing in *Harris* that would lead us to a different conclusion in this case. Here, we find the testimony of Officer Blake and Van Buren adequately support the district court's findings regarding Barney's training, background, and reliability. Significantly, Officer Blake testified that Barney had always had a reliability rate of 90% or higher.

Shimer also argues that Barney's drug sniff was unreliable because he alerted by the passenger door while the packages of marijuana were found in the trunk of the rental car. Evidently, Shimer would have us disregard the evidence in the record that there was also a jar containing marijuana found in the console between the front seats. Unlike the drugs found in the trunk, this marijuana was not sealed in packages. Again, we find the evidence in the record adequate to support the district court's findings as to this question.

We note that in the video of the traffic stop of this case that Barney appears to be engaged and focused during the short period of time it takes for him to walk around the perimeter of the rental car twice. The video shows that Barney alerted almost immediately when he arrived at the passenger door. Then, Officer Blake directs Barney to go around the car an additional time, and Barney again alerts—and indicates by sitting down—by the passenger door. So, we find that the video evidence also supports the district court's finding regarding how the drug sniff was conducted.

Ultimately, the issue of Barney's qualifications and the reliability of the dog sniff comes down to the evidence presented at the suppression hearing. The record reflects that the district court not only considered the testimony presented by the witnesses but also independently reviewed the video of the traffic stop. After doing so, the district court found the opinion of Nicely to be unpersuasive. As noted above, we are not to reweigh the evidence or determine the credibility of witnesses on appeal. Consequently, based on our review of the record, we conclude that the district court's decision regarding the

23

reliability of the drug sniff is supported by substantial competent evidence, and the district court did not err in its legal conclusions in denying the motions to suppress.

*Right to Speedy Trial*

In addition, Shimer contends that his statutory right and constitutional right to a speedy trial were violated in this case. In Kansas, K.S.A. 2014 Supp. 22-3402 guarantees the statutory right to a speedy trial. Likewise, a constitutional right to a speedy trial is guaranteed by the Sixth Amendment to the United States Constitution and section 10 of the Kansas Constitution Bill of Rights. See *State v. Owens*, 310 Kan. 865, 872, 451 P.3d 467 (2019); *State v. Rivera*, 277 Kan. 109, 112, 83 P.3d 169 (2004). Our review of a district court's legal rulings regarding alleged violations of a defendant's right to a speedy trial is unlimited. See *State v. Williams*, 311 Kan. 88, 92, 456 P.3d 540 (2020).

<u>*Statutory Right to Speedy Trial*</u>

Under K.S.A. 2014 Supp. 22-3402(b)—the statute in effect at the time Shimer committed the crimes in this case—the State was required to bring a person charged with a crime and released on bail within 180 days after arraignment. See *State v. Sievers*, 299 Kan. 305, 307, 323 P.3d 170 (2014). It is the State's obligation to ensure that a defendant is provided a speedy trial within the statutory limits, and defendants are not required to do anything to ensure that their right to a speedy trial is honored. See *State v. Dupree*, 304 Kan. 43, 49, 371 P.3d 862 (2016). In this case, Shimer was arraigned at a hearing held on April 18, 2016, and released on bond.

The right to a speedy trial may be formally waived by a defendant. See *State v. Bloom*, 273 Kan. 291, 310, 44 P.3d 305 (2002). In addition to a formal waiver, the right to a speedy trial may be waived by a defendant's request for a continuance or filing of motions that delay the trial beyond the statutory deadline. In addition, defense counsel's

actions that delay trial are directly attributable to the defendant unless he or she timely voices disagreement with counsel's actions. See *State v. Brownlee*, 302 Kan. 491, 506-07, 354 P.3d 525 (2015).

A review of the record in this case reveals that Shimer and his trial counsel made several requests for continuances and also filed numerous pretrial motions that delayed the trial date. Most significant, however, is that Shimer expressly waived his right to a speedy trial at a hearing on September 1, 2016. Moreover, Shimer did not seek to revoke his waiver until he filed his motion to dismiss on December 15, 2017.

The record reflects that Shimer—who was personally present at the hearing on September 1, 2016—waived his right to a speedy trial. Specifically, the hearing transcript sets out the following exchange between Shimer and the district court regarding his desire to waive his right to a speedy trial:

> "THE COURT: Okay. And, Mr. Shimer, you understand that you're not waiving your right to a trial. It is simply a right to have that within the time that's allotted by the speedy trial time.
> "THE DEFENDANT: Yes, ma'am.
> "THE COURT: You understand that?
> "THE DEFENDANT: Mr. Rork explained that to me in detail.
> "THE COURT: Okay . . . so you had that . . . that discussion with him, and that's what you want to do, sir. Is that correct?
> "THE DEFENDANT: Yes, ma'am.
> "THE COURT: And you've had enough time to talk to your attorney about that?
> "THE DEFENDANT: I'm satisfied, ma'am.
> "THE COURT: Okay. And let me ask you sir, are you under the influence of drugs, or alcohol, or anything that would—medications, anything that would keep you from understanding what you're doing here today or the questions that I'm posing to you?
> "THE DEFENDANT: No, ma'am.

25

"THE COURT: Okay. And has anyone forced you, or threatened you, or coerced you, or gotten you to waive your speedy—your right to a speedy trial against your will?

"THE DEFENDANT: No, ma'am.

"THE COURT: Okay. And you're doing this voluntarily?

"THE DEFENDANT: Yes, ma'am.

"THE COURT: And knowingly?

"THE DEFENDANT: Yes, ma'am.

"THE COURT: Okay. The Court will accept the waiver of speedy trial by Mr. Shimer in this matter, finding that it's freely, voluntarily made, with full understanding of the consequences. So I think, on Mr. Shimer's matter—

"THE DEFENDANT: Ma'am, you said consequences. What—

"THE COURT: Consequences that it wouldn't bet set within the—

"THE DEFENDANT: Okay.

"THE COURT: —within the speedy—

"THE DEFENDANT: Okay.

. . . .

"THE COURT: That it's going to be outside of that . . . time.

"THE DEFENDANT: Yes, ma'am. I gotcha.

"THE COURT: Okay. Consequences is a bad word because it sounds like there's something—some punishment—

"THE DEFENDANT: (Unintelligible).

"THE COURT: —and it's not. That's just the word that I use.

"DEFENDANT SHIMER: Thank you, Your Honor."

After this discussion was held, Shimer's trial counsel specifically asked the district court not to set a new jury trial date until it had ruled on all of the pending pretrial motions. However, neither Shimer nor his attorney indicated that the waiver of the right to speedy trial was limited to the time the district court ruled on these motions. Although the hearing transcript contains language to suggest that Gilbeau-Braum's waiver was limited to the time necessary for the district court to hear and rule on pending pretrial motions, we find no such language relating to Shimer. Thus, we agree with the district court that Shimer waived his right to a speedy trial on September 1, 2016.

26

Even if Shimer had not expressly waived his right to a speedy trial, based on our calculations, it appears as if only 138 can be attributed to the State: (1) 84 days from April 18, 2016, to July 11, 2016; and 54 days from December 15, 2017, to February 7, 2018. Although Shimer's trial began well after the 180 days required by the statute, nearly all of the continuances were attributable to the defense. The time chargeable to the defendant begins on the date the defendant's motion is filed. See *State v. Hammerschmidt*, 57 Kan. App. 2d 449, 457, 453 P.3d 1185 (2019). Shimer filed numerous motions during the pendency of trial, and he has failed to argue that any of the specific time attributed to the defense should have been attributed to the State.

The record shows that Shimer unequivocally and expressly waived his right to a speedy trial, and he never revoked that waiver until he filed a motion to dismiss. In addition, he failed to show that any of the time attributed to the defense should have been attributed to the State. As such, Shimer has failed to show that his statutory right to a speedy trial was violated.

### *Constitutional Right to Speedy Trial*

In addition, Shimer briefly argues that the delay in his trial violated his constitutional right to a speedy trial under the United States Constitution and the Kansas Constitution. This right begins to run when the defendant is arrested or formally charged, whichever happens first. *State v. Owens*, 310 Kan. 865, 872, 451 P.3d 467 (2019). In *Owens*, the Kansas Supreme Court directs us to consider the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972): (1) the length of the delay; (2) the reason or reasons for the delay; (3) the defendant's assertion of the right to a speedy trial; and (4) prejudice to the defendant. *Owens*, 310 Kan. at 869. These factors are to be considered along with all of the relevant circumstances of the case. *Barker*, 407 U.S. at 533.

Here, the jury trial occurred over 3 years after Shimer's arrest. Although there is no set duration for a delay to be considered presumptively prejudicial—and such a finding depends on the circumstances of each case—this is a significant delay. See *Barker*, 407 U.S. at 530. In fact, such a delay may be presumptively prejudicial. See *State v. Weaver*, 276 Kan. 504, 510-11, 78 P.3d 397 (2003) (a 15-month delay was presumptively prejudicial when the defendant was charged with possession of cocaine with intent to sell). As such, we find that this *Barker* factor weighs in favor of Shimer.

Nevertheless, we find that the other *Barker* factors weigh in favor of the State. As discussed above, the defense filed numerous pretrial motions, requested that the district court rule on the pretrial motions before setting the trial date, and many of the continuances were specifically requested by the defense. Also, after waiving his right to a speedy trial on September 1, 2016, he made no attempt to revoke his waiver until he filed a motion to dismiss on December 15, 2017. Lastly, Shimer does not identify any specific prejudice that allegedly resulted from the delay in his trial and merely makes a conclusory statement in his brief that he "suffered prejudice as a result of these delays." Issues not adequately briefed are deemed waived or abandoned. *State v. Salary*, 309 Kan. 479, 481, 437 P.3d 953 (2019).

In summary, we find that three of the four *Barker* factors weigh in favor of the State. In particular, we find Shimer's voluntary waiver of his right to a speedy trial speedy is significant. Furthermore, even after Shimer filed his motion to dismiss reasserting his right to a speedy trial, Shimer requested several additional continuances. As such, any prejudice that may have resulted in the delay in bringing this case to trial resulted from Shimer's pretrial motions and numerous requests for continuances. Accordingly, we conclude that Shimer's constitutional right to a speedy trial under the Sixth Amendment to the United States Constitution and section 10 of the Kansas Constitution Bill of Rights was not violated under the circumstances presented in this case.

*Sufficiency of Conspiracy Evidence*

Finally, Shimer challenges the sufficiency of the evidence of his conviction on the charge of conspiracy to possess marijuana with the intent to distribute. Specifically, Shimer argues the State failed to prove that he entered into an agreement with Gilbeau-Braum to possess marijuana with the intent to distribute. In reviewing whether there was sufficient evidence presented at trial to support a criminal conviction beyond a reasonable doubt, we are to view the record in the light most favorable to the State as the prevailing party. *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018). Once again, we are not to reweigh the evidence or assess the credibility of witnesses. *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016).

We find it important to recognize that a criminal conviction may be supported by circumstantial evidence if such evidence provides a basis on which the finder of fact—in this case the jury—may reasonably infer the existence of the fact in issue. See *State v. McBroom*, 299 Kan. 731, Syl. ¶ 6, 325 P.3d 1174 (2014). The evidence need not exclude every other reasonable conclusion or inference. *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016). If an inference is a reasonable one, the jury has the right to make the inference. *State v. Colson*, 312 Kan. 739, 750, 480 P.3d 167 (2021).

In order to convict Shimer of possession of marijuana with intent to distribute, the State was required to prove, beyond a reasonable doubt that:

> "1. The defendant agreed with another person to commit or assist in the commission of possession of marijuana with the intent to distribute.
> "2. The defendant did so agree with the intent that the crime of possession of marijuana with the intent to distribute be committed.
> "3. The defendant or any party to the agreement acted in furtherance of the agreement by driving from Seattle Washington with at least 450 grams but less than 30 kilograms of marijuana for distribution.

29

"4. This act occurred on or about the 15th day of May 2015, in Geary County, Kansas." Instruction No. 10.

As noted in the jury instruction, an agreement is an element of conspiracy, and the jury was instructed that it had to find that Shimer agreed with others to commit the crime of conspiracy to possess marijuana with the intent to distribute. See K.S.A. 2014 Supp. 21-5302(a); see also *State v. Northcutt*, 290 Kan. 224, 231, 224 P.3d 564 (2010). The existence of an agreement does not need to be proved directly. Rather, "'it is enough if the parties tacitly come to an understanding in regard to the unlawful purpose, and this may be inferred from sufficiently significant circumstances. [Citations omitted.]'" *State v. King*, 308 Kan. 16, 29, 417 P.3d 1073 (2018).

"To prove a conspiracy it must be established that the conspirators had a mutual understanding . . . , a meeting of the minds, for the accomplishment of the common purpose." *State v. Hill*, 252 Kan. 637, 641, 847 P.2d 1267 (1993) (quoting *State v. Roberts*, 223 Kan. 49, 52, 574 P.2d 164 [1977]). See *State v. King*, 308 Kan. 16, 29, 417 P.3d 1073 (2018) (the parties must tacitly come to an understanding about the unlawful purpose). Although conspiracy may not be established merely by association or knowledge of the acts of another party, it is generally established by a reasonable inference that is drawn from acts done in pursuit of a criminal purpose. See *King*, 308 Kan. at 29; *State v. McHone*, No. 93,493, 2006 WL 163455, at *7 (Kan. App. 2006) (unpublished opinion).

A review of the record reveals that the State presented evidence to the jury that even though Shimer and Gilbeau-Braum were not in a relationship, they travelled together by plane from South Carolina to Seattle, Washington. Within the day after they arrived in Seattle, they took a photograph together that was found on Shimer's cell phone that depicted them standing in a marijuana grow house. The photograph was captioned, "We had beautiful babies in Oregon." In another photograph, a large amount of bundled

30

cash was shown lying on a table, and Officer Blake testified that it was bundled in a manner consistent with drug currency.

Shimer and Gilbeau-Braum rented a car in Seattle on May 11, 2015, for an expensive one-way trip to South Carolina. When the rental car was stopped for a suspected traffic violation in Kansas, Shimer was driving and Gilbeau-Braum was a passenger. In response to a question by the officer who pulled them over, Shimer said that he and Gilbeau-Braum were on their honeymoon—which was untrue. In addition, the officer discovered that the route through Kansas was significantly off the most direct and fastest route from the State of Washington to South Carolina.

In the trunk of the rental car the officers found six pieces of luggage, with each piece of luggage filled with packages containing marijuana. The total amount of marijuana found weighed over 60 pounds. Moreover, two pieces of the luggage had labels with Shimer's name on it, and another piece of luggage had a tag with Gilbeau-Braum's name on it. The suitcase with Gilbeau-Braum's name on it contained both marijuana and women's clothes.

Viewing the evidence—and the reasonable inferences drawn therefrom—in the record in the light most favorable to the State, we conclude that the evidence presented to the jury was sufficient to prove beyond a reasonable doubt that Shimer participated in a conspiracy with Gilbeau-Braum to possess marijuana with the intent to distribute.

Affirmed.